PURCHASE AND SALE AGREEMENT

FIRST SELECT, INC.

and

CREDIGY RECEIVABLES INC.

December 27, 2002

EXHIBIT

_5_

Purchase and Sale Agreement

THIS PURCHASE AND SALE AGREEMENT ("Agreement") is made as of December 27, 2002 and is between First Select, Inc., a Delaware corporation ("SELLER"), and Creditsy Receivables Inc., a Nevada corporation ("PURCHASER").

Recitals

A.    SELLER owns certain unsecured consumer credit card accounts and related receivables, contract rights and assets; and

B.    SELLER desires to sell, and PURCHASER desires to purchase, all of SELLER'S right, title and interest in and to the Accounts (as defined below), on the terms and conditions set forth below; and

C.    PURCHASER has requested, and SELLER has agreed, that SELLER will service the Accounts and related receivables so sold and purchased pursuant to this Agreement in accordance with the Interim Servicing Agreement (as defined below) for an interim period after the Closing Date; and

D.    SELLER is a wholly owned subsidiary of Providian National Bank.

NOW, THEREFORE, for valuable consideration, the parties mutually agree as follows:

Agreement

Section 1.    Definitions.

1.1    Capitalized Terms.  For purposes of this Agreement, a capitalized term will have the meaning shown below.

"Account" means a charged-off, unsecured consumer account or receivable acquired by SELLER and listed on the Account Schedule.

"Account Agreement" means the written terms and conditions that govern an Account.

"Account List" means the identity of any Debtor or of the Debtors in the aggregate.

"Account Balance" means, as to each Account, the amount owed to SELLER by the related Debtor (whether billed or unbilled, posted or imposted) as of the Cut-Off Date, including principal, accrued interest and all other Account-related fees and charges as recorded on the TSYS system.  The Account Balance shall be referenced on the Master Disk by the reference code "Current Balance".

"Account Schedule" means a list of the electronic files that SELLER will deliver to PURCHASER in accordance with Section 3.2, setting forth each Account and its Account

Balance and containing the data fields set forth in Appendix A, including, without limitation, a data field for the identity of the original issuer and account number of each Account.

"Acquired Assets" has the meaning described in Section 2.1.

"Actual Loss" means, except as otherwise specified herein, liquidated losses, costs, expenses, damages, liabilities, or penalties, including reasonable legal fees, actually incurred by the PURCHASER or the SELLER, as applicable, in connection with a Third Party Claim. The parties intend that actual out-of-pocket losses be the measure of recovery, except as otherwise specified herein. "Actual Loss" does not and shall not include any costs or expenses for employees, materials, or equipment employed or owned by the SELLER, the PURCHASER, or their respective Affiliates.

"Additional Purchase Price" means the excess of the Purchase Price over the Base Closing Payment.

"Adjusted Cash Flow" means (a) the sum of (without duplication) (i) all sums collected after the Cut-Off Date in respect of the Accounts and (ii) two times the gross proceeds resulting from the sale by PURCHASER of any Accounts, excluding for purposes of this clause (ii) any sales (x) to SELLER pursuant to this Agreement; and (y) to any Original Seller pursuant to an Original Purchase Agreement; less (b) all non-sufficient funds payments and all preference payments made by SELLER or PURCHASER, as applicable.

"Affiliate" means, as to any person or entity, any entity currently or in the future controlled by, controlling, or under common control with, such person or entity. As used herein, "control" shall refer to the direct or indirect ownership, individually or in concert with other persons or entities, of 25% or more of the voting stock or other equity interests in, such entity. The term "Affiliate" also includes an entity with which SELLER or PURCHASER has entered into a binding agreement for a merger or acquisition with that entity, and any Affiliates of such entity.

"Applicable Account-Level Purchase Price Percentage" means, with respect to any Account, the percentage amount opposite the pricing category set forth on Appendix B attached hereto, as such Account's pricing category is identified the Pricing Disk.

"Attorney Agreements" means SELLER'S agreements with third party attorneys to whom Accounts have been referred for collection, and all of SELLER'S rights and obligations with respect thereto.

"Bankrupt Account" means any Account with respect to which a filing has been made by or against the related Debtor under the United States Bankruptcy Code or any other bankruptcy, insolvency or other similar laws providing for relief of debtors, whether such filing is voluntary or involuntary.

"Base Closing Payment" means

-2-

"Business Day" means each day other than Saturday, Sunday or a day on which banking institutions in the States of California or New York are authorized or obligated by law, executive order or governmental decree to be closed.

"Closing" means the execution and delivery of all property, funds, documents, certificates, resolutions, assignments and opinions for the transactions contemplated in this Agreement, as provided in this Agreement.

"Closing Date" means December 27, 2002 or, if all of the conditions precedent to the Closing of both of the parties to this Agreement have not occurred, or the satisfaction of such conditions has not been waived in writing on such date, the Closing Date shall be such later date as shall have been mutually agreed by the parties after such conditions have been satisfied or waived; provided, that in any event the Closing shall occur, if at all, on or prior to December 31, 2002.

"Closing Payment" means the amount shown on the Closing Statement, which PURCHASER will remit to SELLER on the Closing Date.

"Closing Statement" means the preliminary Closing Statement to be delivered as pursuant to Section 3.2 or, upon and after delivery thereof, the final Closing Statement to be delivered pursuant to Section 3.3.

"Collateral" shall have the meaning described in Section 5.12(a).

"Collection Agreements" means SELLER'S agreements with third party collection agencies to which Accounts have been referred for collection and servicing, and all of SELLER'S rights and obligations with respect thereto.

"Collection Report" has the meaning described in Section 3.5.

"Conversion Services" is defined in Section 1.06(a) of the Interim Servicing Agreement.

"Coverages" has the meaning described in Section 11.2.

"Confidential Information" means:

(a)     as to SELLER: (1) any non-public material or information, in written, electronic or any other medium, about SELLER'S business, including without limitation, the names of and information about customers, employees, accounts, market share, data processing systems design, marketing philosophy and objectives, competitive advantages and disadvantages, financial results and any other information of such nature furnished by SELLER to PURCHASER; and (2) any non-public material or information, including without limitation, the Purchase Price.

(b)     as to PURCHASER: (1) any non-public material or information, in written, electronic or any other medium, about PURCHASER'S business, including without

-3-

limitation, the names of and information about customers, employees, accounts, market share, data processing systems design, marketing philosophy and objectives, competitive advantages and disadvantages, financial results and any other information of such nature furnished by PURCHASER to SELLER; (2) with respect to the Accounts on and after the Closing Date, any non-public material or information, including without limitation, the Account Schedule, information about Debtors, covenants, market share, data processing systems, marketing philosophy and objectives, competitive advantages and disadvantages and financial results; and (3) any non-public material or information about the terms of this Agreement or the transaction(s) contemplated in this Agreement, including without limitation, the Purchase Price.

(c)    "Confidential Information" does not include: (1) information that, at the time of disclosure, is already in the disclosing party's rightful possession or is otherwise available to it from any source that does not condition receipt of such information on an obligation not to disclose such information; (2) information that, at the time of disclosure is, or later becomes, available to the public through no action or omission of the disclosing party or its agent; (3) information that the disclosing party has received from another source not having an obligation not to disclose it; and (4) information which is independently developed by the disclosing party without use of or reference to any Confidential Information of the other party. Nothing in this Agreement will prevent a party from disclosing Confidential Information to the extent disclosure of the Confidential Information is required by a federal or state governmental authority (including supervising or examination government authorities) having jurisdiction over that party, or by subpoena or other legal process; provided, that in any such case (other than a supervisory or examination governmental authority) such party shall exercise reasonable efforts to ensure that such information shall not thereafter be made public, whether through the Freedom of Information Act or otherwise. In the case of a requirement by a federal or state governmental authority (other than a supervisory or examination government authority), subpoena or other legal process, the party receiving the subpoena or legal process will give the other party prompt notice of the subpoena or legal process to the extent not prohibited by the subpoena or legal process.

"Cut-Off" has the meaning described in Section 3.1.

"Cut-Off Date" means October 31, 2002.

"Debtor" means each obligor or party liable for payment on an Account.

"Escrow Agent" means such party appointed as escrow agent hereunder as the parties may agree (such agreement not to be unreasonably withheld).

"GAAP" means generally accepted accounting principles in the United States of America, applied on a consistent basis and applied to both classification of items and amounts, and shall include without limitation, the official interpretations thereof by the Financial Accounting Standards Board, its predecessors and successors.

"Indemnification Basket" has the meaning described in Section 9.7.

"Ineligible Account" means an Account as to which one or more of the following is true as of the Cut-Off Date: (a) such Account is the subject of a pending or overtly threatened

-4-

action, suit, proceeding or arbitration in which SELLER or a predecessor is a defendant or cross-defendant, (b) a final judgment on such Account has been entered by a court of competent jurisdiction to the effect that no Debtor is under any legal or equitable enforceable obligation to pay on the Account and that the creditor or other owner on the Account is not entitled to take legal action against any Debtor, (c) SELLER or a predecessor in interest released all Debtors obligated on such Account in writing from all liability on the Account, (d) the Debtor with respect to such Account has provided an affidavit of fraud with respect thereto, (e) such Account has been wholly and completely satisfied, compromised, cancelled, settled, subordinated or rescinded, or any instrument or agreement has been delivered to such effect, or where the SELLER or a predecessor in interest released all Debtors obligated on the Account in writing from liability on the Account, (f) such Account was not owned by SELLER on the Cut-Off Date and was included on the Account Schedule in error and (g) an Account originated by Providian National Bank or Providian Bank as to which the Debtor is domiciled in the state of Alabama or Mississippi.

"Ineligible Account/Receivable Adjustment" shall mean the aggregate reduction in the Purchase Price equal to the aggregate amount for all Ineligible Accounts repurchased pursuant to Section 8.1 and all Ineligible Receivables for which an adjustment is made pursuant to Section 8.2, equal to (a) the Account Balance of such Ineligible Account repurchased or the amount by which the applicable Account Balance is adjusted by virtue of an Ineligible Receivable, as applicable, multiplied by (b) the Applicable Account-Level Purchase Price Percentage relating to each such Account.

"Ineligible Receivable" means the applicable portion of an Account Balance which SELLER has agreed to waive or otherwise settle with a Debtor, including but not limited to such portion of an Account which, on the Cut-Off Date, is noted as "4005", "6713" or "3705" on the TSYS system or "BKPENDING0", "PENDING0", or "PND0" "PENDINGOPB" on the Ontario system.

"Interest Rate" means a per annum rate equal to the prime or base rate publicly announced by Citibank, N.A. from time to time, minus one percentage point (1.00%). Interest shall be calculated on the basis of actual number of days elapsed in a 365-day year.

"Interim Servicing Agreement" means that certain Interim Servicing Agreement entered into between SELLER, as servicer, and PURCHASER, as purchaser, on or prior to the Closing, which shall be substantially in the form attached hereto as Appendix D.

"Master Disk" means (1) the final master compact disk, produced by SELLER on Imation CD-R 700MB/80MIN media, serial number 5120GH011LE0100D4, containing the file "FSC   EXPORT FINAL Deal7.txt", created on December 17, 2002 and provided to PURCHASER in the course of its due diligence out by SELLER with all files that SELLER proposed to be considered part of the master file together with (a) that certain file, produced by SELLER on FujiFilm CD-R 700MB/80MIN media, serial number 9G1152K0185980, named "MASTER Judgment File.txt" created on November 14, 2002 and provided to PURCHASER in the course of its due diligence; (b) that certain file, produced by SELLER on Imation CD-R 700MB/80MIN media, serial number 5120GH011LE0093D4, containing the file "First Select All Payments Data.txt", created on November 12, 2002 and provided to PURCHASER in the

course of its due diligence; (c) that certain file, produced by SELLER on Imation CD-R 700MB/80MIN media, serial number 5120GH01LH 8995 D4, containing the file "FSC EXPORT DFJR LK.txt", created on November 19, 2002 and provided to PURCHASER in the course of its due diligence; and (d) that certain file, produced by SELLER on Imation CD-R 700MB/80MIN media, serial number 5120GG619LH 0877 D6, containing the file "FSC EXPORT DFTR FSC.txt", created on December 17, 2002 and provided to PURCHASER in the course of its due diligence and (2) together with the foregoing, the individual data fields identified on Appendix A, a copy of all such files identified above to be produced on one or more master disks to be produced by SELLER in encrypted form and to be delivered to the Escrow Agent at Closing.

"Original Seller" means a seller under an Original Purchase Agreement.

"Original Purchase Agreement" has the meaning set forth in Section 2.3(a).

"Origins Disk" means a compact disk, containing an archive in PGP SDA encrypted form, delivered by PURCHASER to SELLER, such archive containing the file "FinalPutBackFileByAccountCategories 12212002.txt" created on Saturday, December 21, 2002, 10:43:41 AM and having a CRC value of 1fb0964d and delivered to SELLER on December 23, 2002.

"Purchase Price" has the meaning set forth in Section 2.6.

"Purchase Price Percentage" means ~~_____~~ % of all

"Servicing Fee" shall mean, prior to the Servicing Transfer Date, during the period from the Cut-Off Date to and including the Servicing Transfer Date, calculated in accordance with the Interim Servicing Agreement, and, on and after the Servicing Transfer Date, such other compensation and other fees as are mutually agreed with respect to additional services.

"Servicing Transfer Date" shall mean the earlier of the date all Accounts are converted to PURCHASER's system, or March 15, 2003, provided that such date may be extended by PURCHASER pursuant to the terms of the Interim Servicing Agreement, but in no event beyond 120 days after the Closing Date.

"Tax" means any federal, state or local tax of the United States or any of them, including, without limitation, any income tax, franchise tax, real or personal property tax, employment tax, sales or use tax, vault tax, and any related interest or penalties (including, without limitation, those levied on any failure to make appropriate withholdings), but not including any tax levied or chargeable to the transactions contemplated in this Agreement.

"Third Party Claim" shall have the meaning set forth in Section 9.5.

"TSYS" means Total Systems Services, Inc.

1.2    **Appendices and Schedules.** Each appendix and schedule referred to in this Agreement is attached to and incorporated in, and will be construed as a part of, this Agreement.

-6-

Section 2.    Purchase and Sale of Accounts; Assumption of Liabilities; Purchase Price.

2.1    Purchase and Sale.

On the Closing Date, PURCHASER shall purchase from SELLER, and SELLER shall sell, convey, assign and transfer to PURCHASER, all of SELLER'S right, title and interest in, to and under the following assets, and the following rights and privileges granted by SELLER as the same exist on the Closing Date: (i) the Accounts; (ii) the Account Balances; (iii) all rights and privileges under the Account Agreements to receive all payments on Accounts due from Debtors on and after the Cut-Off Date; (iii) the Attorney Agreements to the extent related to the Accounts; and (iv) the Collection Agreements to the extent related to the Accounts, all pursuant to a bill of sale in the form attached hereto as Appendix C and/or an assignment and assumption agreement in the form attached hereto as Appendix E. The assets described in this Section 2.1 are referred to collectively as the "Acquired Assets".

2.2    Excluded Assets.  SELLER'S assets not specifically listed or included in the Acquired Assets will remain the property of SELLER.  Without limiting the preceding sentence, SELLER will retain all right, title and interest in and to each of its accounts that is not an Account, as well as the related account balances, all rights and privileges under the related account agreements, and any related attorney agreements or collection agreements.

2.3    Assumption of Liabilities.

(a)    Commencing on the Closing Date and subject to the terms of this Agreement, PURCHASER will assume, perform and discharge the following obligations arising on and after the Cut-Off Date with respect to the Accounts, all pursuant to an assignment and assumption agreement in the form attached hereto as Appendix E.

(i) the obligations under the Account Agreements, including without limitation, any obligations under any modification or payment plan entered into prior to the Closing Date with respect to such Account and any obligations relating to Account for which match pay funds have been received, all of which obligations (including modifications thereof) are set forth on the Account notes maintained by TSYS;

(ii) the obligation to pay costs or expenses related to the ownership of the Accounts accruing or incurred after the Cut-Off Date, but excluding any costs accruing or incurred by SELLER or any Affiliate associated with servicing the Accounts from the Cut-Off Date through the Servicing Transfer Date (it being understood and agreed that all costs and expenses owing to third parties, including, but not limited to, costs in respect of TSYS, Ontario, Collection Agreements and Attorney Agreements for actions taken prior to the Servicing Transfer Date (regardless of whether such costs are yet due and payable), but excluding (i) conversion costs payable by SELLER to TSYS in connection with conversion and (ii) costs in connection with (a) substitutions of SELLER as a party to litigation and (b) assignments of judgments, shall be deemed to have been accrued and/or incurred by Seller, provided, that costs, in the case of (ii)(a) and

-7-

(3)(b), shall be limited to court costs if PURCHASER prepares all required substitution and assignment documentation);

(iii) the obligations under any agreements pursuant to which SELLER or an Affiliate purchased such Accounts ("Original Purchase Agreements") required by SELLER to be assumed by PURCHASER and as set forth on Appendix F attached hereto;

(iv) any obligations under Collection Agreements or Attorney Agreements as set forth on Appendix G attached hereto; provided that with respect to any such Collection Agreements or Attorney Agreements true and correct copies of which were not provided at Closing, the assumption of obligations thereunder shall be governed by the applicable assignment and assumption.

(b)   Excluded Liabilities.  Notwithstanding the foregoing, PURCHASER will not assume (i) any liability, agreement, commitment or other obligation of SELLER or an Original Seller, whether absolute, contingent or otherwise known or unknown, arising from SELLER'S or an Original Seller's ownership of the Accounts on or before the Closing Date (except as specifically provided to the contrary hereunder) and (ii) any obligation under any agreement with an Original Seller that constitutes a continuing obligation to purchase accounts thereunder or under a similar flow agreement on and after the Cut-Off Date.

2.4   No Recourse.  Except for post-Closing activities set forth in Section 3.4 and SELLER'S repurchase obligations as set forth in Sections 6.1 and 10, the sale and transfer of Accounts contemplated in this Agreement will be without recourse and without representation or warranty, express or implied, of any kind or character, including without limitation, warranties pertaining to collectibility, accuracy or sufficiency of information furnished to PURCHASER, except for the representations and warranties expressly set forth in Section 7.1.  PURCHASER'S decision to purchase the Accounts pursuant to this Agreement is and was based upon PURCHASER'S own independent evaluation of information deemed relevant by PURCHASER, including, but not limited to, the information made available by SELLER to PURCHASER, and PURCHASER'S independent evaluation of such information and any other information PURCHASER received from other sources.  PURCHASER acknowledges and agrees that, while SELLER used its commercially reasonable efforts to provide all material information concerning the Accounts to PURCHASER for review prior to the purchase, such information may not be complete.  PURCHASER has relied solely upon its own investigation and it has not relied upon any oral or written information provided by SELLER or its personnel or agents and acknowledges that no employee or representative of SELLER has been authorized to make, and that PURCHASER has not relied upon, any written or oral statements other than those written statements specifically contained in this Agreement and those set forth in Schedule 2.4 attached hereto.  PURCHASER acknowledges that all the Accounts were charged off accounts, and that the significant risk of collectibility and other undesirable characteristics of the Accounts are fully reflected in the discount to face value evidenced by the Purchase Price.

2.5   Tax Liabilities.  SELLER will be liable for any Tax that relates to its acquisition, ownership and operation of the Accounts on or before the Closing Date.

PURCHASER will be liable for any Tax that relates to its ownership and operation of the Accounts on and after the Closing Date.

2.6   Purchase Price.   The purchase price for PURCHASER'S purchase of the Items listed in Section 2.1 ("Purchase Price") will be the aggregate sum of the Account Balances as of the Cut-Off Date, multiplied by the Purchase Price Percentage.   The Purchase Price will be determined, paid and adjusted in accordance with Section 3.

Section 3.   Closing.

3.1   Closing Procedure.   The Cut-Off will be at 11:59 p.m. (Pacific Time) on the Cut-Off Date, and the Closing will be at or before 5:00 p.m. (Pacific Time) on the Closing Date.   The parties may consummate the Closing by using facsimile transmissions and overnight couriers.   On the Closing Date, (i) SELLER shall deliver the Master Disk to the Escrow Agent; (ii) PURCHASER shall deliver the Pricing Disk to the Escrow Agent and (iii) SELLER shall deliver the binder constituting Schedule 2.4 of this Agreement to the Escrow Agent.

3.2   Preliminary Closing Statement.   On or before December 23, 2002 SELLER delivered to PURCHASER (i) the Account Schedule, listing each Account as of the Closing Date in the form of electronic or computer tape media on Imation CD-R 700MB/80MIN media, serial number 5120CH011LH0100D4, containing the file "FSC EXPORT FINAL Dec17.txt", created on December 17, 2002 and (ii) the preliminary Closing Statement, based on actual Account information on the TSYS system current as of close of business December 13, 2002 and estimated Account information for the period after close of business on December 13, 2002 to December 31, 2002.

3.3   Closing Payment.   The preliminary Closing Statement will show SELLER'S calculation of the Closing Payment as of the Closing Date as follows

(a)   the Base Closing Payment; less

(b)   any amounts received as payments on the Accounts after the Cut-Off Date and before the close of business on December 13, 2002 and amounts estimated to be received on or before December 31, 2002, net of any non-sufficient funds payments and any preference payments made by SELLER; less

(c)   interest on the amounts received on any payment on the Accounts described in clause (b) above, at the Interest Rate, accruing as to each such payment commencing on the date such payment was or is received by SELLER; less

(d)   the aggregate sum of the products of multiplying each Ineligible Receivable by the Applicable Account-Level Purchase Price Percentage; plus

(e)   the Servicing Fee payable to SELLER in accordance with the Interim Servicing Agreement from the Cut-Off Date to December 13, 2002 and estimated amounts payable to SELLER thereafter on or before December 31, 2002; plus

-9-

(f)    Interest on the Base Closing Payment (estimated on the basis of information available as of the Cut-Off Date) which is deemed to have accrued from the Cut-Off Date to the day immediately preceding the Closing Date at the Interest Rate.

The preliminary Closing Statement will also designate the account name and number of the account to which SELLER wants PURCHASER to pay the Closing Payment by wire transfer. The PURCHASER shall deliver the Closing Payment to SELLER on the Closing Date.

3.4    Post-Closing Adjustment.  On or before January 31, 2003, SELLER shall provide to PURCHASER a final Closing Statement based upon actual information as contained in the TSYS system with respect to the Accounts on December 31, 2002 and, on the next succeeding Business Day, PURCHASER or SELLER shall make a net payment to one another reflecting adjustments based on (i) variances between actual amounts collected as of December 31, 2002 as shown on the final Closing Statement and estimated amounts shown on the preliminary Closing Statement; (ii) interest on such adjustments at the Interest Rate; (iii) adjustments of Servicing Fees arising from collections prior to December 31, 2002 and not reflected in the preliminary Closing Statement; (iv) repurchase of any Accounts determined to have been Ineligible Accounts as of the Closing Date and not accounted for in the preliminary Closing Statement (such repurchase to be effected at the Applicable Account-Level Purchase Price Percentage), (v) adjustments in respect of Ineligible Receivables not accounted for in the preliminary Closing Statement (such adjustment to be effected at the Applicable Account-Level Purchase Price Percentage) and (vi) non-sufficient funds payments, repayments of payments received by SELLER as preference items, and other payments, receipts and adjustments thereof of any nature related to the Acquired Assets received by SELLER and not reflected in the preliminary Closing Statement.  In the event the net amount of such adjustments is negative, SELLER shall pay such amount to PURCHASER, and in the event such net amount is positive, PURCHASER shall pay such amount to SELLER using the calculations set forth in Section 3.3 of this Agreement.

3.5    Reports of Adjusted Cash Flow.  On January 6, 2003 and on the day an invoice is presented to PURCHASER by SELLER thereafter (which shall be not less frequently than monthly) prior to the Servicing Transfer Date, SELLER shall provide to PURCHASER a report of Adjusted Cash Flow received for the period from the Closing Date or the date of the most recent prior report to the date of such report, and which report shall show the cumulative amount of the Adjusted Cash Flow (such report, a "Collection Report").  SELLER shall deliver such Collection Report in electronic form with Account-level information.  On the 30th calendar day after the Servicing Transfer Date, PURCHASER and SELLER shall prepare a report making any adjustments to the Servicing Fee payable in respect of the periods prior to the Servicing Transfer Date, and corresponding adjustments, if any, shall be made to the Adjusted Cash Flow based upon such report and such adjustment shall be reflected on any subsequent Collection Report.   On (i) the fifteenth day of the calendar month following each fiscal quarter of PURCHASER so long as aggregate Adjusted Cash Flow is less than $300,000,000, and (ii) the fifteenth day of each month thereafter, until the Additional Purchase Price shall have been fully and finally paid, PURCHASER shall prepare and provide a Collection Report showing Adjusted Cash Flow received for the period from the date of the prior such report.  Collection Reports shall be in the form attached hereto as Appendix H.

-10-

3.6   Payment of Additional Purchase Price. On and after the date on which the aggregate Adjusted Cash Flow shall exceed ~~reduced~~ by any amount attributable to Accounts repurchased by SELLER under Section 6.1 or Section 10, SELLER shall be entitled to an amount equal to ~~of~~ such Adjusted Cash Flow in excess of such amount, until the sum of the Base Closing Payment and the aggregate sum of payments received under this Section 3.6 shall, in the aggregate, equal the Purchase Price. The Additional Purchase Price required to be paid under this Section 3.6 shall be made in monthly installments on the 15th of the calendar month based upon receipts for the preceding calendar month

3.7   Adjustments to Purchase Price. The final Purchase Price payable by PURCHASER hereunder shall be such amount as reflects all adjustments required hereunder, including but not limited to the Ineligible Account/Receivable Adjustments.

## Section 4.   Confidentiality.

4.1   SELLER will use all Confidential Information with respect to PURCHASER, including without limitation, SELLER'S Confidential Information which is transferred to PURCHASER on the Closing Date, solely in the performance of SELLER'S obligations under this Agreement. Without PURCHASER'S prior written approval, SELLER will not disclose, give, sell or otherwise transfer or make available, directly or indirectly, any Confidential Information with respect to PURCHASER, to any of their respective officers, directors, employees, agents and Affiliates or to any third party or employee or representative of a third party unless, and if so, then solely to the extent that, that person or entity: (1) has a reasonable need to know the information to perform duties related to this Agreement and (2) agrees to comply with the provisions of this covenant. SELLER will take reasonable measures to prevent its employees, Affiliates and agents from disclosing or using any Confidential Information with respect to PURCHASER except as provided in this Agreement. Notwithstanding the foregoing, SELLER or an Affiliate of SELLER may disclose Confidential Information of PURCHASER only in the following situations: (1) to an Affiliate to the extent needed to comply with securities law requirements applicable to SELLER or any Affiliate; (2) to the extent required by applicable law or regulation (including request of examiners and regulators having appropriate jurisdiction); (3) to its attorneys, auditors and lenders, so long as those attorneys, auditors and lenders agree to comply with the provisions of this covenant; and (4) to the extent such disclosure is appropriate in connection with the enforcement of any of the provisions of this Agreement; provided that prior notice of any disclosure described by the foregoing (other than disclosure to SELLER'S Affiliates, regulators, auditors, counsel or lenders) has been given to PURCHASER, when legally permissible, and that SELLER (i) uses commercially reasonable efforts to provide sufficient notice to permit PURCHASER to take legal action to prevent the disclosure or seek an appropriate protective order, (ii) exercises reasonable efforts, at SELLER'S expense, to obtain reliable assurances that confidential treatment will be accorded the information so disclosed, and (iii) in the event of any disclosure described in clause (2) above, exercises reasonable efforts to ensure that such information shall not thereafter be made public, whether through the Freedom of Information Act or otherwise.

-11-

4.2    PURCHASER will use all Confidential Information with respect to SELLER solely in the performance of PURCHASER'S obligations under this Agreement; provided that, starting on the Closing Date, Confidential Information relating specifically to the Accounts will become Confidential Information with respect to PURCHASER and will no longer be Confidential Information of or with respect to SELLER and PURCHASER shall have obligation-of-confidentiality-or-nondisclosure-with-respect-to-such-Account-related-Confidential Information. Without SELLER'S prior written approval, PURCHASER will not disclose, give, sell or otherwise transfer or make available, directly or indirectly, any Confidential Information with respect to SELLER, to any of its officers, directors, employees, agents and Affiliates or to any third party or employee or representative of a third party unless, and if so, then solely to the extent that, that person or entity: (1) has a reasonable need to know the information to perform duties related to this Agreement, and (2) agrees to comply with the provisions of this covenant. PURCHASER will take reasonable measures to prevent its employees, Affiliates and agents from disclosing or using any Confidential Information with respect to SELLER except as provided in this Agreement. Notwithstanding the foregoing, PURCHASER or an Affiliate of PURCHASER may disclose Confidential Information of SELLER only in the following situations: (1) to an Affiliate to the extent needed to comply with securities law requirements applicable to PURCHASER or any Affiliate; (2) to the extent required by applicable law or regulation (including request by examiners or regulators having appropriate jurisdiction); (3) to its attorneys, auditors and lenders, so long as those attorneys, auditors and lenders agree to comply with the provisions of this covenant; and (4) to the extent such disclosure is appropriate in connection with the enforcement of any of the provisions of this Agreement; provided that prior notice of any disclosure described by the foregoing (other than disclosure to PURCHASER'S Affiliates, regulators, auditors, counsel or lenders) has been given to SELLER, when legally permissible, and that PURCHASER (i) uses commercially reasonable efforts to provide sufficient notice to permit SELLER to take legal action to prevent the disclosure or seek an appropriate protective order, (ii) exercises reasonable efforts, at PURCHASER'S expense, to obtain reliable assurances that confidential treatment will be accorded the information so disclosed, and (iii) in the event of any disclosure described in clause (2) above, exercises reasonable efforts to ensure that such information shall not thereafter be made public, whether through the Freedom of Information Act or otherwise

In the event of termination of this Agreement, each party shall return or destroy all Confidential Information, and all copies thereof, irrespective of medium, to the other party, and shall, upon request of such other party, certify as to the return or destruction of such Confidential Information.

The covenants in this Section 4 will survive the Closing Date and, if this Agreement is terminated prior to Closing, such covenants shall survive termination of this Agreement.

Section 5.    Post-Closing Activities.

5.1    Debtor Payments.

(a)    From the Cut-Off Date to the Servicing Transfer Date, the obligations of SELLER with respect to payments received on any Account shall be governed by the Interim Servicing Agreement. On and after the Servicing Transfer Date, and for a period of five (5) years

thereafter, if SELLER receives and collects good funds on an Account, SELLER will hold such funds in trust for PURCHASER and will deliver the funds, without warranty, to PURCHASER together with information reasonably sufficient to enable PURCHASER to credit the same to the appropriate Account as set forth in this Section 5.1. Nothing in the foregoing sentence shall be deemed to constitute SELLER as a fiduciary for PURCHASER for any other purpose than the limited purpose of holding such funds. All such funds shall be wired to PURCHASER in accordance with the wiring instructions set forth on the Collection Report, as amended or substituted by PURCHASER from time to time. For a period of 60 days from the Servicing Transfer Date, SELLER shall wire each payment within three (3) days of receipt by SELLER. Thereafter, SELLER will wire transfer such payment within fifteen (15) days after the end of the month in which such payment was received. Should SELLER fail to wire such funds on or before the required day, then interest shall accrue thereon at the Interest Rate until the date on which such payment is wired to PURCHASER. PURCHASER will post on its system the receipt of payment from the related Debtor as of the date SELLER received such payment from such Debtor. (5.)

(b)    In the event SELLER receives funds on an Account after the five year period referenced above, SELLER shall either (i) to the extent such is practicable and as determined by SELLER, in its sole discretion, on a case by case basis forward the funds to PURCHASER, or (ii) return the funds to the Debtor. For purposes of this Agreement, receipt or collection of payments shall be determined as of the date SELLER receives or collects a payment and entitlement to payments made by a Debtor or their representative and shall not be determined as of the date the Original Seller receives or collects any such payments.

(c)    Notwithstanding anything to the contrary in Section 5.1(a), PURCHASER shall return to SELLER any and all funds previously delivered by SELLER pursuant to Section 5.1(a) above to the extent any such payment(s) made by Debtor(s) to SELLER and forwarded to PURCHASER is or was made with non-sufficient funds or is otherwise required to be returned by SELLER, including without limitation any payment previously received by SELLER which is required to be returned as a preference payment. Such payment(s) shall be made by PURCHASER within ten (10) days of PURCHASER'S receipt of notice from SELLER or, at SELLER'S election, such payment(s) may be offset against any future payment(s) made to PURCHASER pursuant to Section 5.1(a) above.

(d)    The parties agree that this Section 5.1 shall be implemented fairly and equitably so as to avoid the double payment or failure to pay any amount which would result in the unjust enrichment of any party pursuant to the terms hereof.

5.2    PURCHASER'S Communications with Debtors; Power of Attorney.

(a)    If PURCHASER communicates with a Debtor about an Account, PURCHASER will inform the Debtor that the Account has been sold to PURCHASER and that PURCHASER is the creditor of the Account Balance. PURCHASER will not refer any Debtor to SELLER for any reason, but will handle any Debtor inquiries that PURCHASER reasonably cannot answer based upon information obtained from contacting SELLER directly.

-13-

(b)     SELLER shall execute and deliver to PURCHASER on the Closing Date a power of attorney in the form set forth in Appendix I.

5.3     Credit Bureau Reporting. SELLER will use commercially reasonable efforts to report to the three primary credit bureaus on or before June 1, 2003 that SELLER has sold the Account to PURCHASER to the extent that the credit bureau's services include this type of reporting. In doing so, SELLER will report the sale of an Account in the normal course of SELLER's then-current credit-reporting practices, and nothing in this Section 5.3 will require SELLER to credit-report the sale on or before the Closing Date. Except as stated above in this Section 5.3, SELLER will have no obligation with respect to credit-reporting an Account.

5.4     Compliance. PURCHASER will take all necessary action or refrain from taking action as appropriate with respect to the Accounts so as to ensure PURCHASER'S compliance with all federal, state and local laws, rules and regulations applicable to the Accounts, including without limitation, the Fair Debt Collection Practices Act, Gramm-Leach-Bliley Act and the Equal Credit Opportunity Act. Until the full Purchase Price has been paid: (i) PURCHASER has, or will utilize solely entities who have, all required licenses necessary or appropriate to engage in such collection activities as are required in connection with collection of the Accounts; (ii) PURCHASER agrees that it shall only engage with respect to the Accounts collection agencies that are approved by SELLER; the collection agencies set forth on Appendix J are deemed to have been preapproved by SELLER for such purposes; and (iii) PURCHASER shall engage with respect to the Accounts only such new attorneys and new collection agencies that have executed in writing an undertaking that such attorneys and collection agencies shall be subject to audit by SELLER with respect to such Accounts. PURCHASER shall use its commercially reasonable efforts to assist SELLER in effectuating such audits to the extent requested by SELLER in writing. Provided that PURCHASER provides the information with respect to each such collection agency or attorney set forth on Appendix K, SELLER agrees to respond to any request of PURCHASER for approval of a collection agency or attorney within ten (10) Business Days of written request for approval therefor, and in the event such response has not been received on or before the expiration of such period, such request shall be deemed approved. SELLER acknowledges and agrees that Stewart & Associates are preapproved for use by PURCHASER in connection with the Accounts and that under no circumstances shall SELLER be entitled to audit rights with respect to Stewart & Associates. SELLER agrees that in approving or disapproving such requests it shall use standards no more stringent than Providian National Bank uses for collection agencies or attorneys collecting for its own account.

5.5     Access to Account Files; Consultation.

(a)     For a period of two (2) years after the Closing Date, PURCHASER may deliver to SELLER a written request, as to any Account, for SELLER to provide, subject to SELLER'S reasonable ability to obtain (each such request, a "Request for Information") an affidavit signed by SELLER that acknowledges that an Account was sold to PURCHASER under this Agreement and substantially in the form shown on Appendix L; provided that in the event such requests in any calendar week exceed two hundred and fifty (250) requests, then PURCHASER shall reimburse SELLER for the reasonable costs of the retention of additional personnel or the payment of overtime to existing personnel to fulfil such request. Within twenty-five (25) days after receipt of PURCHASER'S written request for information in the possession

of SELLER, and within ninety-five (95) days after receipt of PURCHASER'S written request for information in the possession of an Original Seller and to the extent that SELLER is able to obtain such information, SELLER will provide PURCHASER with the item requested at no cost, provided that the number of Accounts for which no-cost affidavits are provided under this Section 5.5 do not exceed ten percent (10%) of the number of Accounts SELLER sells or sold to PURCHASER under this Agreement provided that PURCHASER shall promptly pay or reimburse SELLER for any out-of-pocket fee or cost which SELLER is, or would be, required to pay under the applicable Original Purchase Agreement. If the total, cumulative number of Accounts for which PURCHASER requests affidavits exceeds ten percent (10%) of the number of Accounts, PURCHASER will pay SELLER ten dollars ($10) for each subsequent affidavit that SELLER provides, and shall also reimburse SELLER for the reasonable costs of the retention of additional personnel or the payment of overtime to existing personnel to fulfil such requests. Each item requested in any Request for Information constitutes a separate Request for Information for purposes of determining the cumulative number of requests, notwithstanding the fact that it may relate to the same Account or Debtor. If SELLER fails to satisfy the Request for Information, SELLER shall repurchase the Account which is the subject of the request in accordance with Section 6.1 hereof. The remedy provided in the immediately preceding sentence can only be used if the SELLER has not exercised good faith.

(b) If PURCHASER files any legal action to collect on an Account and requests or subpoenas an officer or an employee of SELLER or its Affiliate to appear at a trial, hearing or deposition to testify about the Account, PURCHASER will pay SELLER or the Affiliate for the officer's or employee's time in traveling to, attending and testifying at the trial, hearing or deposition, whether or not the officer or employee is called as a witness, at the hourly rate of such officer or employee, and will reimburse the SELLER or the Affiliate for the officer's or employee's reasonable travel-related expenses.

(c) Until the completion of the Conversion Services, as defined in Section 1.06(b) of the Interim Servicing Agreement, SELLER agrees to provide, as to any Account, such information as is reasonably requested in writing by the PURCHASER with respect to costs and expenses reimbursed by SELLER or any Affiliate to any attorney engaged in connection with collection of such Account.

5.6    Third Party Agreements. (a) To the extent that any agreement, contract, commitment, license, permit or authorization to which SELLER is a party prohibits the assignment of Accounts to PURCHASER without the consent of another person which is not obtained by the Closing Date, this Agreement shall not constitute an agreement to assign such Account or Accounts to the extent that an attempted assignment would constitute a breach thereof or be prohibited thereunder.

(b) SELLER agrees that it will (i) to the extent that the applicable collection agency or attorney exercises any right of approval over the assignment of a Collection Agreement or Attorney Agreement and does not permit, or otherwise challenges, the assignment thereof to PURCHASER, recall all Accounts under such Collection Agreement or Attorney Agreement and make such Account available for engagement by PURCHASER of its own collection agency or attorney and (ii) direct such SELLER's collection agency or attorney (or any other collection agency or attorney previously retained by SELLER with respect to such

Account) to deliver to SELLER any records and documents relating to Accounts which are the subject of such Collection Agreement or Attorney Agreement, whereupon SELLER shall deliver such records and documents to PURCHASER. PURCHASER agrees to reimburse SELLER for any additional cost or expense paid or incurred by SELLER in fulfilling its obligations under this Section 5.6(b)(ii), other than the payment of any commission or other expenses incurred or accrued prior to the Servicing Transfer Date.

5.7    Public Announcements. Except as set forth herein neither party will make any public announcement or press release about this Agreement or any of the terms thereof, nor of the transactions contemplated herein or the relationship between the parties without the prior written consent of the other party.

5.8    SELLER Names and Trademarks.

(a)    PURCHASER will not, and hereby represents, warrants, and covenants that it will not at any time, institute or maintain any legal action in the name of SELLER or any of SELLER'S Affiliates, including without limitation, Providian Financial Corporation, Providian National Bank or Providian Bank.

(b)    PURCHASER will not at any time use any name or trademark of SELLER or any of its Affiliates as listed above to market or promote PURCHASER'S products, services or capabilities.

(c)    Subject to the foregoing restrictions in this Section 5.8, PURCHASER may disclose to prospective transferees of Accounts, Debtors or any party in litigation regarding the Accounts that the Accounts were acquired from SELLER.

(d)    PURCHASER will not at any time use or refer to any name or trademark of SELLER, any third party seller or any Affiliates thereof from which SELLER acquired the Accounts (the "Original Seller"), or any name derived therefrom or confusingly similar therewith in connection with PURCHASER'S collection on any Account except that PURCHASER may refer in any verbal or written communication with a Debtor(s) or its or their representative (including, without limitation, in a pleading or other filing) to the fact that the Account originated with or was formerly held by the SELLER, the Original Seller or its or their Affiliates.

5.9    Tax Examinations. SELLER and PURCHASER will cooperate fully with each other in connection with any examination conducted by any tax authority after the Closing Date; provided that nothing in this Agreement will be construed as obligating SELLER or PURCHASER to disclose or furnish any tax information that does not relate to tax liability arising from the Accounts. SELLER and PURCHASER will inform each other promptly of any material developments in the course of the examination as well as the examination results and any related proceeding.

5.10    Consistent Tax Reporting. SELLER and PURCHASER will consistently report information about financial and accounting aspects of the transaction covered by this Agreement to tax authorities. SELLER acknowledges and agrees that it shall be solely responsible for preparing and filing with appropriate filing offices all Forms 1099 with respect to events and activities on and prior to the Cut-Off Date. SELLER shall cooperate with

PURCHASER and shall provide PURCHASER with such information that PURCHASER reasonably requests with respect to any Forms 1099 filed or to be filed by PURCHASER with respect to events and activities after the Cut-Off Date.

5.11    Resale of Accounts.

(a)    PURCHASER shall be prohibited from selling all or any part of any Account prior to the Servicing Transfer Date without the prior written consent of SELLER, which SELLER may grant or deny in SELLER'S sole and absolute discretion; provided, however, that PURCHASER may sell Bankrupt Accounts or Accounts for which the related Debtor has been classified as Bankrupt in the Master Disk without such prior written consent.

(b)    On and after the Servicing Transfer Date, PURCHASER may resell any Account to another purchaser ("Third Party Purchaser") with the prior written consent of SELLER, which shall not be unreasonably withheld or delayed, provided each of the following conditions are satisfied: (i) PURCEASER provides SELLER at least seven (7) days' prior written notice of each such intended resale; (ii) such Third Party Purchaser assumes any obligation of PURCHASER under this Agreement and under any obligations under Original Purchase Agreement which obligations have been assumed by PURCHASER; (iii) the sale of such Account, when aggregated with all Accounts previously sold to Third Party Purchasers, does not exceed 20% of the aggregate face amount of the Accounts (excluding for purposes of this calculation, the sale of Bankrupt Accounts and Ineligible Accounts); and (iv) PURCHASER shall not have failed to comply with the next succeeding sentence with respect to such sale. In order to satisfy clause (ii) above, PURCHASER will require the Third Party Purchaser to agree in writing with PURCHASER to assume PURCHASER'S obligations under this Agreement with respect to the Account(s) by attaching a copy of this Agreement to any subsequent agreement between PURCHASER and such Third Party Purchaser, with each references to the Purchase Price Percentage and the Applicable Account-Level Purchase Price Percentage redacted. SELLER agrees that it will respond to any such written notice pursuant to clause (i) above within three (3) days of receipt thereof.

(c)    Notwithstanding the foregoing, under no circumstances shall PURCHASER sell or negotiate or attempt to negotiate a sale of any Accounts (including without limitation Bankrupt Accounts) to any of the companies or their Affiliates listed on Appendix N-2, or of Accounts originated by Providian Bank or Providian National Bank to any of the companies or their Affiliates listed on Appendix N-1 or N-2 hereto at any time, nor shall PURCHASER provide information with respect to any Account the sale of which would be prohibited to any of the companies or their Affiliates listed on Appendix N-1 or N-2 hereto at any time.

(d)    In the event that the sale of one or more Accounts to a Third Party Purchaser satisfies all of the conditions set forth in paragraph (b) above, except that such sale, when aggregated with all prior sales, exceeds 20% of the aggregate face amount of the Accounts (excluding for purposes of this calculation, the sale of Bankrupt Accounts and Ineligible Accounts), then, notwithstanding anything to the contrary in paragraph (b), prior written consent of SELLER may be withheld or denied in SELLER'S sole and absolute discretion; provided, however, that if such sale occurs after the date on which SELLER has received the entire

Purchase Price to which it is entitled, the SELLER'S consent may not be withheld or denied in its sole and absolute discretion, but instead shall be subject to the conditions, and SELLER's consent shall be subject to the limitations, set forth in paragraph (b) above.

(c)    In the event SELLER withholds its consent to any Third Party Purchaser, under paragraph (a), (b) or (c) above, or PURCHASER sells any interest in violation of paragraph (c) above, any purported assignment of this Agreement shall be deemed ineffective and SELLER shall have no obligation to recognize or deal with any such Third Party Purchaser.

Notwithstanding any sale or assignment of any Accounts, PURCHASER will remain liable to SELLER for all of PURCHASER'S obligations under this Agreement.

5.12    Grant of Security Interest; UCC-1 Filing.

(a)    The parties hereto agree that the transactions contemplated hereby shall constitute a sale and assignment of accounts and receivables to PURCHASER and not a loan to SELLER. Notwithstanding the foregoing, in the event that Article 9 of the UCC applies or may apply to the transactions contemplated hereby, and to otherwise secure payment of and performance by SELLER of any and all of its indebtedness, liabilities and obligations, now existing or hereafter arising whatsoever, in each case solely, pursuant to this Agreement, including, without limitation, all obligations of SELLER under this Agreement to perform acts or refrain from taking any action, SELLER hereby grants to PURCHASER, effective as of the Closing, a first priority continuing security interest in and to all of SELLER'S right, title and interest in, to and under the Acquired Assets (in each case, existing at any time, now or in future), together with the proceeds thereof (collectively, the "Collateral"). SELLER agrees to cooperate fully with PURCHASER as PURCHASER may reasonably request in order to give effect to the security interest granted by this Section 5.12(a), including, without limitation, filing of any UCC-1 or comparable statements prepared by PURCHASER, in form and content mutually acceptable to each of SELLER and PURCHASER, in order to perfect such security interest. Appendix O attached hereto sets forth an agreed upon description of the Collateral for inclusion in any such financing statement.

(b)    In furtherance of the agreements in Section 5.12(a), SELLER hereby makes the additional representations set forth in Appendix P which are hereby incorporated into this Agreement. For a period of five (5) years from the Closing Date, SELLER shall not change its name, state of organization, or any of the locations set forth in Appendix Q without giving PURCHASER at least thirty (30) days prior written notice thereof.

(c)    For a period of five (5) years from the Closing Date, if SELLER changes its corporate name, it shall promptly furnish to PURCHASER signed copies of all filings relating thereto and shall promptly take all actions as may be reasonably requested by PURCHASER and necessary or appropriate to preserve and maintain at all times the perfection and priority of the security interests and liens granted or purported to be granted to PURCHASER hereunder with respect to the Collateral (provided that SELLER shall have no obligation to prepare any financing statements in connection therewith or incur any expenses other than those agreed to be reimbursed by PURCHASER).

-18-

(d)    SELLER hereby authorizes PURCHASER to file financing statements concerning the Collateral in accordance with paragraph (a) above. In addition, SELLER will execute any documents reasonably requested by PURCHASER and acceptable to SELLER to further evidence or perfect the security interest in the Collateral pursuant to this Agreement, use commercially reasonable efforts to cooperate with PURCHASER and perform such other acts ~~requested by PURCHASER for the perfection of such security interest. Under no circumstances~~ shall SELLER be required to take any action to create or perfect a security interest in assets other than the Collateral.

(e)    Prior Rights.   Notwithstanding anything to the contrary in this Section 5.12, the security interest of PURCHASER in the Collateral shall be at all times subject and subordinate to the security interest of any lender providing financing for PURCHASER'S acquisition of the Acquired Assets.

5.13   Financial Statements.   On and after the Closing Date, PURCHASER shall provide to SELLER, the following financial statements and other documents:

(a)    within 45 days of the end of each fiscal quarter of PURCHASER or any special purpose entity organized in connection with the securitization or other financing of the Accounts, beginning with the first quarter of 2003, company prepared financial statements for such quarter, including a balance sheet, statement of operations and statement of cash flows, all prepared in accordance with GAAP except for footnote disclosures and attested as true and correct by an officer of each such entity;

(b)    within 120 days of the end of each fiscal year of PURCHASER and any special purpose entity organized in connection with the securitization or other financing of the Accounts, beginning with the year ending December 31, 2003 company-prepared financial statements for such fiscal year;

(c)    on and after PURCHASER'S aggregate gross receipts with respect to the Accounts exceeds ▓▓▓▓▓ promptly as required under the constituent documents relating to any securitization of all or some of the Accounts, any reports to the applicable trustee, including remittance reports and, if requested by SELLER, copies of the most current bank statement relating to the applicable collection accounts, and any independent public accountants servicing report.

(d)    Upon request by the SELLER, or in the event requested by PURCHASER'S lender, PURCHASER shall provide audited financial statements of PURCHASER or any such special purpose entity organized in connection with securitization of the Accounts, including the unqualified opinions of their certified public accountants, balance sheets, and footnotes redacted for confidential information as at the end of the immediately preceding fiscal year, all in reasonable detail and all prepared in accordance with GAAP. The SELLER shall pay the reasonable out-of-pocket expenses of preparation of such audited financial statements or, if such statements are also requested by PURCHASER'S lender, shall equally split such costs and expenses.

5.14   Certain Covenants of SELLER.

(a) Preservation of Business. From the date of this Agreement and continuing until the Closing Date, SELLER, except as expressly contemplated hereby, shall operate its business with respect to the Accounts and the Acquired Assets only in the ordinary course of business and shall use commercially reasonable efforts to: (i) maintain and service the Accounts in accordance with its applicable policies and procedures as currently in effect and safe and sound business practices; (ii) maintain and service the Accounts in compliance with applicable law and regulations in all material respects; and (iii) not make any change to SELLER's applicable policies and procedures that would have a material adverse effect on the Accounts or the Acquired Assets except as required by law or safe or sound business practices. SELLER shall, and shall cause its agents to, post all payments received prior to the Closing Date to the applicable Account in a manner that complies with all applicable laws and regulations.

(b) Preservation of Accounts. Notwithstanding anything else to the contrary contained herein, unless otherwise agreed to in writing by PURCHASER, from the date of this Agreement and continuing until the Closing Date, SELLER shall: (i) not sell, assign, transfer, pledge or encumber, or permit the encumbrance of, any Acquired Assets (other than Accounts repurchased under Section 6.1 or Section 10) or Account Balance without the prior written consent of PURCHASER; (ii) not take any action with respect to the Acquired Assets which shall impair any material rights of SELLER other than in the ordinary course of business, and shall not amend any Original Purchase Agreements, Collection Agreements or Acquired Assets without PURCHASER'S prior written consent; (iii) comply through the Closing Date with the terms and conditions of the Account Agreements, as then in effect; and (iv) promptly inform PURCHASER (A) of any material litigation or proceeding, challenging the purchase and sale of the Acquired Assets hereunder, (B) upon acquiring knowledge of any material adverse change in the financial condition of the Accounts, and (C) any material billing errors, claims, disputes or litigation with respect to the Accounts.

(c) Access. From the Closing Date until the Servicing Transfer Date, SELLER shall (i) permit PURCHASER and its authorized representatives full access, during reasonable hours to its business operations, and shall furnish PURCHASER with true, accurate and complete copies of such contracts and other such records and all other information in its possession with respect to the Acquired Assets as PURCHASER may reasonably request. For a period of two years from the Closing Date, at PURCHASER'S sole cost and expense, SELLER shall cause its personnel and its agents to provide PURCHASER assistance in its investigation of the matters set forth in clauses (i) and (ii) of the preceding sentence, provided, however, that such investigation shall be conducted in a manner which does not unreasonably interfere with SELLER'S normal business operations, and provided further that SELLER shall not be required to divulge, and shall not divulge, any records, including certain information, to the extent prohibited by applicable statues or regulations.

(d) SELLER'S Further Assistance. For a period of two years from the Closing Date, SELLER will also cooperate with and assist PURCHASER and its representatives in obtaining access to information to assist PURCHASER in securitizing the Acquired Assets (or any portion thereof) as PURCHASER may reasonably request; provided, however, that SELLER shall be compensated for reasonable out-of-pocket expenses and management time in connection with performing its obligations under this Section 5.14(d); provided further that the foregoing (1) shall not require SELLER to permit any inspection, or to disclose any information, that would

-20-

result in the disclosure of any trade secrets of third parties, or trade secrets of SELLER or any Affiliate of SELLER unrelated to the transactions contemplated by this Agreement or the applicable securitization, or violate any obligations of SELLER to any third party with respect to confidentiality if SELLER shall have used commercially reasonable efforts to obtain the consent of such third party to such inspection or disclosure, or (2) shall not require any disclosure by ~~SELLER that shall, as a result of such disclosure, have the effect of causing the waiver of any~~ attorney-client privilege. The parties agree that SELLER shall have no obligation to prepare or provide any reports other than (i) the reports currently prepared by it in the ordinary course of business relating to the Accounts and (ii) any additional reports that SELLER is obligated to provide under the Interim Servicing Agreement; provided that SELLER shall not be obligated to prepare or provide any such reports at any time following the Servicing Termination Date. Except as otherwise provided in this Agreement, SELLER shall take no action after the Closing Date that would be inconsistent with the effective transfer by SELLER to PURCHASER hereunder of SELLER'S entire right, title and interest in and to the Acquired Assets. For a period of one year from the Closing Date, SELLER shall use reasonable efforts to provide Debtors who call SELLER after the Servicing Termination Date with the customer service or collection telephone numbers of PURCHASER, as designated by PURCHASER.

(e)    Cooperation. SELLER shall cooperate with PURCHASER in furnishing any information or performing any action reasonably requested by PURCHASER, which information or action is necessary for the prompt consummation of the transactions contemplated by this Agreement, provided further that the foregoing (1) shall not require SELLER to permit any inspection, or to disclose any information, that would result in the disclosure of any trade secrets of third parties, or trade secrets of SELLER or any Affiliate of SELLER unrelated to the transactions contemplated by this Agreement, or violate any obligations of SELLER to any third party with respect to confidentiality if SELLER shall have used commercially reasonable efforts to obtain the consent of such third party to such inspection or disclosure, or (2) shall not require any disclosure by SELLER that shall, as a result of such disclosure, have the effect of causing the waiver of any attorney-client privilege.

(f)    Other Required Information. SELLER shall promptly furnish to PURCHASER all information as is required or requested to be set forth in any application or statement to be filed with any governmental authority in connection with the regulatory approval or review of the transactions contemplated by this Agreement.

(g)    Collections on the Accounts. On and after the Closing Date, PURCHASER shall have the sole right to receive all collections with respect to the Account Balances. Notwithstanding the foregoing, SELLER may make collections on the Accounts for PURCHASER pursuant to the Interim Servicing Agreement. SELLER agrees to pay to PURCHASER all payments on Accounts that are received by SELLER, as servicer under the Interim Servicing Agreement, on and after the Closing Date.

(h)    Nonpetition Covenant. Notwithstanding any prior termination of this Agreement, SELLER shall not, prior to the date which is one year and one day after all securities backed by the Acquired Assets in any securitization are paid in full, petition, join in the institution against the PURCHASER, or otherwise invoke or cause PURCHASER to invoke the process of any governmental authority for the purpose of commencing or sustaining a case

-21-

against PURCHASER or any Affiliate of PURCHASER under any federal or state bankruptcy, insolvency or similar law or appointing a receiver, conservator, liquidator, assignee, trustee, custodian, sequestrator or other similar official of PURCHASER or such Affiliate or any substantial part of its property or ordering the winding-up or liquidation or the affairs of PURCHASER or such Affiliate.

(i) <u>Use of Account Information</u>. In order that PURCHASER may have and enjoy the full benefit of the Acquired Assets, SELLER agrees that, for a period of three (3) years following the Closing Date, neither SELLER nor any of its Affiliates, will use the Account list, including the identity of any Debtor, in whole or in part, for the purpose of soliciting any Debtor for any product, including, without limitation, credit card and revolving loan products, whether directly or indirectly, or otherwise provide the list of acquired Accounts to any third party.

(j) <u>List of Outsourced Accounts</u>. SELLER shall furnish to PURCHASER prior to the Closing Date a list or other reasonable method of designating Accounts as to which the collection of the Account Balances relating thereto has been outsourced to (i) collection agents and (ii) attorneys.

(k) <u>No Action</u>. SELLER shall refrain, and shall cause its Affiliates and the employees, agents, and subcontractors of SELLER and SELLER'S Affiliates to refrain, from taking any action that would create or otherwise result in any obligation to an Original Seller after the Closing Date affecting the Account Balances without PURCHASER'S prior written consent.

5.15 <u>Certain Covenants of PURCHASER</u>

(a) <u>Cooperation</u>. PURCHASER shall cooperate with SELLER in furnishing any information or performing any action reasonably requested by SELLER, which information or action is necessary for the prompt consummation of the transactions contemplated by this Agreement, provided further that the foregoing (1) shall not require PURCHASER to permit any inspection, or to disclose any information, that would result in the disclosure of any trade secrets of third parties, or trade secrets of PURCHASER or any Affiliate of PURCHASER unrelated to the transactions contemplated by this Agreement, or violate any obligations of PURCHASER to any third party with respect to confidentiality if PURCHASER shall have used commercially reasonable efforts to obtain the consent of such third party to such inspection or disclosure, or (2) shall not require any disclosure by PURCHASER that shall, as a result of such disclosure, have the effect of causing the waiver of any attorney-client privilege.

(b) <u>Other Required Information</u>. PURCHASER shall promptly furnish to SELLER all information as is required or requested to be set forth in any application or statement to be filed with any governmental authority in connection with the regulatory approval or review of the transactions contemplated by this Agreement.

Section 6. <u>Ineligible Accounts; Repurchase of Ineligible Accounts; Adjustments in respect of Ineligible Receivables</u>.

6.1 SELLER does not intend to sell to PURCHASER, and PURCHASER does not intend to buy from SELLER, any Account falling within the definition of an "Ineligible

Account" as of the Cut-Off Date.  SELLER will use reasonable efforts to determine that Accounts do not include Ineligible Accounts.  Within one hundred and twenty (120) days after the Servicing Transfer Date, if either party gives written notice and reasonable written proof to the other party that SELLER sold to PURCHASER one or more Ineligible Accounts, SELLER will repurchase, and shall be entitled to compel PURCHASER to resell, all such Ineligible Accounts.  The Ineligible Accounts will be repurchased at the end of each calendar month, for a price equal to the aggregate amount of (i) the Account Balance of each Ineligible Account as of the Cut-Off Date, excluding any interest or fees accrued since the Cut-Off Date, multiplied by (ii) the Applicable Account-Level Purchase Price Percentage for such Ineligible Account.  PURCHASER shall, at the time of each such repurchase, remit (i) ~~%~~ of the aggregate amount of payments received by PURCHASER, if any, in respect of such Ineligible Account repurchased prior to the Servicing Transfer Date and (ii) ~~%~~ of the aggregate amount of payments received by PURCHASER, if any, in respect of such Ineligible Accounts repurchased on or after the Servicing Transfer Date.  Such repurchase price shall be paid within forty-five (45) days following receipt of the applicable notice and proof as indicated above, and upon PURCHASER'S execution and delivery of any and all such documents as are necessary for PURCHASER to transfer to SELLER good, valid and marketable title to the Ineligible Accounts, subject to PURCHASER'S receipt of good, valid and marketable title as provided in Section 7.1(c).  To the extent that any party fails to receive written notice accompanied by the documentation required by this Section 6.1 that an Ineligible Account has been sold to PURCHASER within one hundred and twenty (120) days following the Servicing Transfer Date, such party's right or obligation to repurchase such Ineligible Account(s) shall terminate.  As soon as practicable after the repurchase of the Ineligible Account, PURCHASER shall report to each credit bureau that such PURCHASER has transferred the Ineligible Account to SELLER.

6.2    Seller does not intend to sell and PURCHASER does not intend to purchase, any portion of an Account falling within the definition of Ineligible Receivable as of the Cut-Off Date. SELLER will use reasonable efforts to determine that Accounts do not include portions which are Ineligible Receivables.  Within one hundred and twenty (120) days after the Servicing Transfer Date, if either party gives written notice and reasonable written proof to the other party that SELLER sold to PURCHASER one or more Accounts portions of which fell on such date within the definition of Ineligible Receivables, SELLER will adjust the Purchase Price by an amount equal to the aggregate amount of (a) such portion of the Account Balance attributable to each Ineligible Receivable, multiplied by (b) the Applicable Account-Level Purchase Price Percentage for the account containing such Ineligible Receivable, and shall remit such adjustment to PURCHASER.

6.3    No Other Repurchase Right.  NEITHER SELLER NOR PURCHASER SHALL BE ENTITLED TO REQUIRE THE OTHER TO REPURCHASE, RESELL, OR FACILITATE A REPURCHASE OR RESALE OF AN ACCOUNT FOR ANY REASON, EXCEPT AS SPECIFICALLY SET FORTH HEREIN AND IN SECTION 10.  PURCHASER AND SELLER ACKNOWLEDGE THAT THE RIGHT TO REQUIRE REPURCHASE AS PERMITTED UNDER SECTION 6.1 (TOGETHER WITH PURCHASER'S RIGHT UNDER SECTION 9.1 TO BE INDEMNIFIED FOR THIRD-PARTY CLAIMS RELATING TO SUCH SELLER'S BREACH OF REPRESENTATION AND WARRANTY REGARDING THE ACCOUNTS) IS THE SOLE REMEDY ARISING OUT OF OR IN CONNECTION WITH AN ACCOUNT BEING DEEMED AN

INELIGIBLE ACCOUNT. PURCHASER AND SELLER ALSO ACKNOWLEDGE THAT THE RIGHT TO REQUIRE ADJUSTMENT AS PERMITTED UNDER SECTION 6.2 (TOGETHER WITH PURCHASER'S RIGHT TO BE INDEMNIFIED FOR THIRD-PARTY CLAIMS) IS THE SOLE REMEDY ARISING OUT OF OR IN CONNECTION WITH A PORTION OF AN ACCOUNT BEING DEEMED AN INELIGIBLE RECEIVABLE. PURCHASER ACKNOWLEDGES AND AGREES THAT THE ACCOUNTS MAY HAVE LITTLE OR NO VALUE.

Section 7.    Representations and Warranties.

7.1    SELLER'S Representations and Warranties to PURCHASER. SELLER hereby represents and warrants to PURCHASER as follows:

(a)    Organization and Power. SELLER is a duly organized and validly existing corporation under the laws of the State of Delaware. SELLER is in good standing under the laws of the State of Delaware and is qualified to do business in the State of California. SELLER has full power and authority to enter into and perform the terms of this Agreement.

(b)    Authority, Validity and Enforceability. SELLER'S execution, delivery and performance of this Agreement have been duly and validly authorized by all necessary corporate action and do not and will not conflict with or result in the breach or violation of SELLER'S charter or by-laws, of any material agreement to which SELLER is a party or by which it is bound, or of any law or court or administrative order having jurisdiction over it. This Agreement is the legally binding obligation of SELLER, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency, moratorium, receivership, conservatorship and laws relating to creditors' rights generally, and except as limited by equitable principles. SELLER did not execute any document relating to the transactions contemplated by this Agreement or otherwise effectuate or consummate any sale or transfer to PURCHASER pursuant to this Agreement, in each case (i) in contemplation of insolvency, (ii) with a view to preferring one creditor over another or to preventing the application of its assets in the manner required by applicable law or regulations, (iii) after committing an act of insolvency, or (iv) with an intent to hinder, delay, or defraud itself or its creditors.

(c)    Ownership. SELLER is the sole and absolute owner of, and has good and marketable title to, each Account and Acquired Asset, and, except as set forth on Schedule 7.1(c), the Accounts and Acquired Assets are not subject to any claim or encumbrance relating to ownership or title, including, without limitation, tax liens.

(d)    Government Approval. Except as set forth on Schedule 7.1(d), no authorization of or notice to any governmental authority or court having jurisdiction over SELLER or the Accounts or any Acquired Asset is required for, or the absence of which would adversely affect, the execution, delivery and performance of this Agreement or the transactions contemplated in this Agreement, except for such regulatory approvals as are contemplated herein, which would have a material adverse effect on the value of the Accounts or any Acquired Asset, and all of the authorizations or notices set forth on Schedule 7.1(d) have been received or given on or before the date of this Agreement.

-24-

(e)   Actions, Suits and Proceedings.   Except as set forth on Schedule 7.1(e), there are no administrative or court actions, suits, arbitrations, class actions or proceedings currently pending, that, if adversely decided, could reasonably be expected to have a material adverse effect on the value of the Accounts or any Acquired Asset or on SELLER'S ability to perform its obligations under this Agreement or the Interim Servicing Agreement.  To the best of SELLER'S knowledge after SELLER'S reasonable inquiry within its organization, no actions, suits, class actions or proceedings are threatened, that, if adversely decided, could reasonably be expected to have a material adverse effect on the value of the Accounts or any Acquired Asset or on SELLER'S ability to perform its obligations under this Agreement or the Interim Servicing Agreement.

(f)   No Brokers or Finders.   SELLER has not employed any investment banker, broker or finder who might be entitled to a fee or commission in connection with the transactions contemplated by this Agreement.

(g)   Compliance with Laws.   Except as set forth on Schedule 7.1(e), (i) the Accounts, Account Agreements and all related documents comply in all material respects with all settlements relating to litigation and all applicable laws, rules, orders, decrees and regulations and SELLER is in compliance in all material respects with all applicable laws and regulations with respect to the maintenance and servicing of the Accounts; (ii) the interest rates, fees and charges in connection with the Accounts comply with all applicable laws and regulations; (iii) SELLER has made no promise, agreement or commitment to any Debtor in connection with an Account other than settlement agreements, interest rate reductions, payment plans and match pay arrangements in the ordinary course of business; (iv) each Account Agreement is the legal, valid and binding obligation of the Debtor and any guarantor or co-signer named therein and is enforceable in accordance with its terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium and other laws relating to or affecting creditors' rights generally and by general equity principles, and is not subject to offset, recoupment, adjustment or any other claim except for the rights of Cardholders under 12 CFR §226.12(c), 12 CFR §226.13(d) and the Soldiers' and Sailors' Civil Relief Act or rights under settlement agreements, interest rate reductions, payment plans and match pay arrangements in the ordinary course of business; and (v) each of the Account Balances arises from or in connection with a bona fide sale or loan transaction (including any amounts in respect of finance charges, annual fees and other charges and fees assessed on Accounts). SELLER has utilized, or will utilize, solely entities who have, all required licenses necessary or appropriate to engage in such collection activities as are required in connection with collection of the Accounts except where the failure to have such licenses shall not have a material adverse effect on the Accounts.

(h)   Necessary Authorization.   SELLER has all required permits, licenses, certificates and authorizations necessary to conduct its Account-related business and acquire, own, service and sell the Accounts.

(i)   Performance of Obligations.   Except as set forth on Schedule 7.1(e), SELLER has performed all obligations required to be performed by it to date under the Account Agreements, the Original Purchase Agreements, the Acquired Assets or the Collection Agreements, and SELLER is not in default under, and no event has occurred with respect to SELLER'S performance under the Account Agreements the Original Purchase Agreements, the

Acquired Assets or the Collection Agreements which, with the lapse of time or action by a third party, is reasonably likely to result in a material default by SELLER under, any such agreements which would reasonably be expected to have a material adverse effect on the Accounts or the Acquired Assets or the SELLER'S ability to perform its obligations hereunder or pursuant to the Interim Servicing Agreement. All Account Agreements, the Original Purchase Agreements, the Acquired Assets and the Collection Agreements are legal, valid and binding obligations of SELLER, fully enforceable by the respective parties thereto in accordance with their respective terms, except as such enforcement may be limited by insolvency, reorganization, moratorium, receivership, conservatorship, the rights and obligations of conservators or receivers of insured depository institutions under 12 U.S.C. §1821(d) and (e), the Soldiers' and Sailors' Civil Relief Act of 1940, as amended, and other laws relating to or affecting creditors' rights generally and by general equity principles and except as modified by settlement agreements, interest rate reductions, payment plans and match pay arrangements in the ordinary course of business.

(j) <u>Operation of Business</u>. Except as set forth on Schedule 7.1(j), since August 19, 2002, SELLER has not (i) effected any change in its policies and procedures relating to the Accounts that would have a material adverse effect on the Accounts or the Acquired Assets; (ii) entered into any transaction or made any commitment or agreement with Debtors in connection with the Accounts, other than the receipt of payments on the Accounts in the ordinary course of SELLER'S business or pursuant to settlement agreements, interest rate reductions and payment plans in the ordinary course of business or match pay arrangements in the ordinary course of business; or (iii) amended the terms of any Account Agreement, other than in connection with settlement agreements, interest rate reductions and payment plans in the ordinary course of business. Since August 19, 2002, SELLER has serviced the Accounts and the Account Balances with the same degree of skill and attention that SELLER exercised with respect to its other accounts not conveyed hereby. SELLER has obtained all consents and approvals required to be obtained from any nongovernmental third party required in connection with the execution and delivery of this Agreement, the sale and assignment of the Accounts and servicing therefor to the PURCHASER and the performance of SELLER's obligations hereunder. SELLER represents that attached hereto as Appendix M is a list of all such consents which are necessary to effectively assign the Accounts to PURCHASER.

(k) <u>Effect of Law on Closing</u>. There is no federal or state statute, rule or regulation, or order or rule of any federal or state regulatory agency that would prevent SELLER from selling the Acquired Assets to PURCHASER as contemplated by this Agreement, would result in the imposition of any penalty, tax or assessment against PURCHASER or the Acquired Assets, or would prevent SELLER from performing its obligations under the Interim Servicing Agreement.

(l) <u>Accuracy of Information</u>. The Master Disk is a true, accurate and complete listing in all material respects of all the Accounts being transferred to PURCHASER, and the information contained therein in the data fields set forth on Schedule 7.1(l) is true, accurate and complete in all material respects, provided that the data field designated "CO Balance from Vendor" on the Master Disk accurately and completely sets forth the information in that regard obtained from the Original Seller. Each statement set forth in Schedule 2.4 is true and accurate in all material respects; provided that: (i) any statement contained in an email included in Schedule 2.4 should be read in light of the circumstances under which such email

was transmitted and under which such statement was made, and (ii) as to any statement contained in collection agency reports, SELLER is unable to represent and warrant as to the truth and accuracy thereof, but, in lieu of such a representation and warranty, represents and warrants that such collection agency reports are used by SELLER in the ordinary course of its business and that SELLER has no knowledge that any matter stated in any collection agency report included in Schedule 2.4 is untrue or inaccurate in any material respect. Schedule 7.1(l) correctly identifies all Original Purchase Agreements, and Appendix G (i) correctly identifies all attorneys who are parties to the Attorney Agreements and refers to all Attorney Agreements by reference to the certified copies thereof being delivered by SELLER to PURCHASER on the Closing Date, and (ii) correctly identifies all Collection Agreements, in the case of either clause (i) or (ii), as amended, modified or supplemented and in effect on the date hereof, and true and correct copies of each thereof were provided to PURCHASER on the date of this Agreement, except for such Attorney Agreements which have not been delivered and are specified as such on Appendix G.

(m) No Alteration. SELLER acknowledges that the PURCHASER'S bid of the Purchase Price was determined, in part, by PURCHASER in reliance upon the tape of Accounts presented to PURCHASER by SELLER prior to the date of this Agreement, and accordingly SELLER and its agents have not removed any of the Accounts, other than Ineligible Accounts disclosed to PURCHASER, or otherwise altered the characteristics or attributes of such Accounts since presented to PURCHASER and SELLER agrees to deliver such Accounts on the Closing Date.

(n) Eligible Accounts. At the Closing Date, no Account is an Ineligible Account.

(o) Ineligible Receivables. At the Closing Date, each Account Balance does not contain an Ineligible Receivable; provided that the this paragraph (o) is a warranty only, and not a representation.

(p) No Other Representations or Warranties. EXCEPT AS EXPRESSLY PROVIDED TO THE CONTRARY IN THIS AGREEMENT, THE ACCOUNTS ARE BEING SOLD "AS-IS" AND "WITH ALL FAULTS", WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER, AND SELLER SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST OR PRESENT, EXPRESS OR IMPLIED, CONCERNING THE COLLECTIBILITY OF THE ACCOUNTS OR THE ACCURACY OR SUFFICIENCY OF INFORMATION FURNISHED TO THE PURCHASER.

7.2    PURCHASER'S Representations and Warranties to SELLER. PURCHASER hereby represents and warrants to SELLER as follows: .

(a) Organization and Power. PURCHASER is a duly organized and validly existing corporation under the laws of the State of Nevada, and is currently in good standing under the laws of such state. PURCHASER has full power and authority to enter into and perform this Agreement.

-27-

(b)  Authority, Validity and Enforceability.  PURCHASER'S execution, delivery and performance of this Agreement have been duly and validly authorized by all necessary corporate action and do not and will not conflict with or result in the breach or violation of PURCHASER'S charter or by-laws, of any material agreement to which PURCHASER is a party or by which it is bound, or of any law or court or administrative order having jurisdiction over PURCHASER. This Agreement is the legally binding obligation of PURCHASER, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency, moratorium, receivership, conservatorship and laws relating to creditors' rights generally, and except as limited by equitable principles.

(c)  Government Approval.  No authorization of or notice to any governmental authority or court having jurisdiction over PURCHASER is required for, or the absence of which would adversely affect, the execution, delivery and performance of this Agreement or the transactions contemplated in this Agreement.  The total combined assets of PURCHASER and any other entity within PURCHASER'S corporate group required to be included with PURCHASER for determination of the applicability of the Hart-Scott-Rodino Antitrust Improvements Act, based upon its most recently prepared financial statements, is less than

(d)  Actions, Suits and Proceedings.  There are no administrative or court actions, suits, arbitrations or proceedings currently pending, and to the best of PURCHASER'S knowledge after PURCHASER'S reasonable inquiry within its organization, no actions, suits or proceedings are threatened, that if adversely decided would have a material adverse effect on PURCHASER'S ability to carry out the transactions contemplated in this Agreement.

(e)  Not an Investment Company.  PURCHASER is not an investment company as defined under the Investment Company Act of 1940, as amended.

(f)  Sophisticated Investor.  PURCHASER is an informed purchaser that is in the business of buying or originating or collecting accounts of the type being purchased or that otherwise deals in accounts of the nature of the Accounts in the ordinary course of the PURCHASER'S business.

(g)  No Brokers or Finders.  PURCHASER has not employed any investment banker, broker or finder who might be entitled to a fee or commission in connection with the transactions contemplated by this Agreement.

(h)  Financial and Operational Capacity.  PURCHASER has, or will have prior to the Closing, the financial capacity to consummate the transactions contemplated under this Agreement.  PURCHASER has delivered to SELLER a written commitment of a third party financing source acceptable to SELLER or other evidence satisfactory to SELLER of financing to enable PURCHASER to consummate the transactions contemplated under this Agreement.

(i)  Compliance.  PURCHASER is in compliance with all federal, state and local laws, rules and requirements necessary for the consummation of the transactions contemplated hereunder and the anticipated servicing, maintenance and collection of the Accounts.  PURCHASER has, or will utilize solely entities who have, all required licenses

-28-

necessary or appropriate to engage in such collection activities as are required in connection with collection of the Accounts.

(j) Withholding Tax. SELLER is not required to withhold any portion of the Purchase Price based upon the status of PURCHASER or any Affiliate of PURCHASER.

Section 8.    Conditions to Closing; Termination.

8.1    Conditions to Obligation of SELLER. The obligation of SELLER to consummate the transactions contemplated in this Agreement is subject to the satisfaction of each of the following conditions precedent:

(a) Representation and Warranties True. Each representation and warranty of PURCHASER in this Agreement shall be true and correct as of the Closing Date.

(b) Compliance with Obligations. PURCHASER shall have complied in all material respects with its covenants and agreements in this Agreement by the Closing Date, and all conditions to its obligations hereunder shall have been satisfied or otherwise waived.

(c) No Violation; No Litigation. PURCHASER shall not have violated any court order or governmental order or any law or regulation that would have an adverse effect on the transaction contemplated in this Agreement. No claim, action, proceeding, arbitration or government investigation is threatened or instituted which is likely to restrict or prohibit or otherwise have a material adverse effect on the transactions contemplated in this Agreement.

(d) Regulatory Consents. SELLER shall have obtained all regulatory approvals, consents or nonobjections which, in the opinion of SELLER and its counsel, are required to enter into and perform its obligations under this Agreement and the Interim Servicing Agreement, and no such approvals, consents or nonobjections contain any conditions or other requirement that, in the reasonable judgment of SELLER, are materially burdensome.

(e) Assumption of Obligations under Agency and Attorney Contracts. PURCHASER shall have delivered to SELLER such instruments and other documentation as are necessary in the opinion of SELLER and its counsel, to effect and evidence the assumption by PURCHASER of any obligations arising under any Collection Agreements or Attorney Agreements relating to any of the Accounts.

(f) Hart-Scott-Rodino Antitrust Improvements Act. SELLER shall be satisfied that the transaction contemplated hereunder is exempt from the notice requirements of the Hart-Scott-Rodino Antitrust Improvements Act or such notice shall have been given thereunder to the appropriate regulatory agencies and the waiting period with respect thereto shall have expired or have been terminated.

(g) Opinion of Counsel. Counsel for PURCHASER shall have delivered to SELLER an opinion of counsel in form and substance acceptable to SELLER and its counsel as to such matters as is reasonably requested by SELLER and its counsel.

(h)    Assumption of Obligations under Original Purchase Agreements.  To the extent required under an Original Purchase Agreement or required by SELLER, PURCHASER shall have executed such instruments or documents as are necessary or advisable to effect the assumption by PURCHASER of the obligations of SELLER under any such Original Purchase Agreement.

(i)    Deliveries at Closing.  The Closing Payment shall have been made and all documents to be delivered and actions to be taken on or before Closing by PURCHASER shall have been delivered or taken.

(j)    Closing Certificate.  PURCHASER shall have delivered a certificate of its Chief Executive or Chief Financial Officer to the effect that the conditions set forth in paragraphs (a) and (b) have been satisfied.

(k)    No Material Adverse Change.  Since the Cut-Off Date, there shall have been no material adverse change in the condition, financial or otherwise, of the PURCHASER other than any change attributable to or resulting from (i) events, conditions or trends in economic, business or financial conditions generally but not including any events, conditions or trends which have a disproportionate adverse impact on PURCHASER, (ii) general changes in conditions in or otherwise affecting the credit card industry but not including any changes which have a disproportionate adverse impact on PURCHASER, or (iii) this Agreement or the announcement or performance of this Agreement.

(l)    Certification of Schedule 2.4.  SELLER shall have received a certificate of a responsible officer of PURCHASER that the binder delivered to the Escrow Agent by SELLER as Schedule 2.4 constitutes Schedule 2.4 to this Agreement.

8.2    Conditions to Obligation of PURCHASER.  The obligation of PURCHASER to consummate the transactions contemplated in this Agreement is subject to the satisfaction of each of the following conditions precedent:

(a)    Representations and Warranties True.  Each representation and warranty of SELLER in this Agreement shall be true and correct as of the Closing Date.

(b)    Compliance with Obligations.  SELLER shall have complied in all material respects with its covenants and agreements in this Agreement by the Closing Date, and all conditions to its obligations hereunder shall have been satisfied.

(c)    No Violation; No Litigation.  SELLER shall not have violated any court order or governmental order or any law or regulation that would have an adverse effect on the transaction contemplated in this Agreement.  No claim, action, proceeding, arbitration or government investigation shall have been threatened or instituted which is likely to restrict or prohibit or otherwise have an adverse effect on the transaction contemplated in this Agreement.

(d)    Confirmation of Certain Items.  SELLER shall have confirmed to PURCHASER that the Master Disk fairly and accurately reflects, in all material respects, the information contained therein, including but not restricted to the Account Balances and the payment history of the Accounts.

(e)     Regulatory Consents.    SELLER shall have obtained all regulatory approvals, consents or nonobjections which, in the opinion of SELLER and its counsel, are required to enter into and perform its obligations under this Agreement and the Interim Servicing Agreement, and no such approvals, consents or nonobjections contain any conditions or other requirement that, in the reasonable judgment of PURCHASER, are materially burdensome.

(f)     Hart-Scott-Rodino Antitrust Improvements Act.   PURCHASER shall be satisfied that the transaction contemplated hereunder is exempt from the notice requirements of the Hart-Scott-Rodino Antitrust Improvements Act or such notice shall have been given thereunder to the appropriate regulatory agencies and the waiting period with respect thereto shall have expired or have been terminated.

(g)     Opinion of Counsel.    Counsel for SELLER shall have delivered to PURCHASER an opinion of counsel in form and substance acceptable to PURCHASER and its counsel as to such matters as is reasonably requested by PURCHASER and its counsel.

(h)     Deliveries at Closing.  All documents to be delivered and actions to be taken on or before Closing by SELLER shall have been delivered or taken.

(i)     Closing Certificate.  SELLER shall have delivered a certificate of its Chief Executive or Chief Financial Officer to the effect that the conditions set forth in paragraphs (a) and (b) have been satisfied.

(j)     No Material Adverse Change.   Since the Cut-Off Date, there shall have been no material adverse change in the condition, financial or otherwise, of the SELLER, the Accounts or the Acquired Assets other than any change attributable to or resulting from (i) events, conditions or trends in economic, business or financial conditions generally but not including any events, conditions or trends which have a disproportionate adverse impact on SELLER, the Accounts or the Acquired Assets, (ii) general changes in conditions in or otherwise affecting the credit card industry but not including any changes which have a disproportionate adverse impact on SELLER, the Accounts or the Acquired Assets, or (iii) this Agreement or the announcement or performance of this Agreement.

(k)     Providian National Bank Guaranty.  Providian National Bank shall have executed a guaranty of the obligations of SELLER under this Agreement and the Interim Servicing Agreement in the form attached hereto as Appendix R.

(l)     Certification of Original Purchase Agreements, Attorney Agreements and Collection Agreements.  PURCHASER shall have received copies of each Original Purchase Agreement, Attorney Agreement and Collection Agreement, such copies having been certified as true and correct copies of the relevant agreement, except for those Attorney Agreements and Collection Agreements, copies of which were not available prior to the Closing and specified as such in Appendices F and G, as the case may be.

(m)     Certification of Schedule 2.4.   PURCHASER shall have received a certificate of a responsible officer of SELLER that the binder delivered to the Escrow Agent as Schedule 2.4 constitutes Schedule 2.4 to this Agreement.

8.3    Termination.  This Agreement may be terminated and the transactions contemplated hereunder abandoned at any time prior to the Closing:

(a)    by the mutual written consent of SELLER and PURCHASER;

(b)    by written notice of PURCHASER to SELLER, if (i) SELLER has materially breached any of its representations, warranties, covenants and agreements contained herein and such breach has not been cured within two Business Days after written notice of such breach shall have been given to SELLER or (ii) a condition to the obligation of PURCHASER shall not have been satisfied on or before the Closing;

(c)    by written notice of SELLER to PURCHASER, if (i) PURCHASER has materially breached any of its representations, warranties, covenants and agreements contained herein and such breach has not been cured within two Business Days after written notice of such breach shall have been given to PURCHASER; or (ii) a condition to the obligation of SELLER shall not have been satisfied on or before the Closing;

(d)    by PURCHASER or SELLER if the Closing shall not have occurred by December 31, 2002.

Except for a termination under paragraph (a) above, each party shall remain liable for failure of such party to perform any obligation of such party notwithstanding termination of this Agreement.

Section 9.    Indemnification.

9.1    Indemnification By SELLER.  Subject to Section 9.7 hereof, SELLER agrees to indemnify and hold harmless PURCHASER, its Affiliates and their respective officers, directors, employees, agents, successors, and permitted assigns, and related entities from and to reimburse them for Actual Losses relating to, arising out of, based upon, or resulting from:

(a)    the SELLER'S material breach of any of its representations and warranties contained in this Agreement (without regard, for purposes of this Section 9.1(a), to any materiality limitation set forth in any such representation or warranty);

(b)    the SELLER'S material breach or failure to perform any of its covenants or agreements contained in or made pursuant to this Agreement (without regard, for purposes of this Section 9.1(b), to any materiality limitation set forth in any such covenant or agreement); or

(c)    any Third Party Claim (which shall be deemed to include any claim or loss arising from the litigation or other proceedings disclosed in Schedule 7.1(e)); or

(d)    any action or failure to act by the SELLER, prior to the Servicing Transfer Date or by an Original Seller or any of their employees, agents or representatives occurring prior to the Closing Date.

Notwithstanding the foregoing, SELLER shall have no obligation to indemnify PURCHASER or any Affiliate, officer, director, employee, agent, successor or assign of PURCHASER for any

Actual Losses arising out of or related to any act or omission of PURCHASER with respect to an Account or any Acquired Asset, including but not limited to with respect to the maintenance and servicing of the Accounts by PURCHASER or any other party, including without limitation any Third Party Purchaser on prior to the date servicing is transferred to PURCHASER or any such third party.

9.2    Indemnification By PURCHASER. PURCHASER agrees to indemnify and hold harmless SELLER its Affiliates and their respective officers, directors, employees, agents, successors, and permitted assigns, and related entities from and to reimburse them for Actual Losses relating to, arising out of, based upon, or resulting from:

(a)    the PURCHASER'S material breach of any of its representations and warranties contained in this Agreement (without regard, for purposes of this Section 9.2(a), to any materiality limitation set forth in any such representation or warranty);

(b)    the PURCHASER'S material breach or failure to perform any of its covenants or agreements contained in or made pursuant to this Agreement (without regard, for purposes of this Section 9.2(b), to any materiality limitation set forth in any such covenant or agreement);

(c)    any Third Party Claim; or

(d)    any action or failure to act by the PURCHASER with respect to an Account after the Servicing Transfer Date or such earlier date as servicing is actually transferred to PURCHASER or any third party.

Notwithstanding the foregoing, PURCHASER shall have no obligation to indemnify SELLER or any Affiliate, officer, director, employee, agent, successor or assign of SELLER for any Actual Losses arising out of or related to any act or omission of SELLER with respect to an Account or any Acquired Asset, including but not limited to with respect to the origination, maintenance and servicing of the Accounts by SELLER, the Original Seller or any other party on prior to the Servicing Transfer Date.

9.3    Third Party Claim. "Third Party Claim" means a lawsuit, including a counterclaim or regulatory enforcement action, filed against SELLER or PURCHASER by a party other than either the SELLER or the PURCHASER, respectively, related to any Account purchased under this Agreement and for which there is an Actual Loss that is caused by: (1) the other party's breach of any of its representations and warranties contained in this Agreement, (2) the other party's breach of or failure to perform any of its covenants or agreements contained in this Agreement. A party other than the SELLER includes a Debtor. A Third Party Claim includes an appeal if approved by the PURCHASER or the SELLER, as applicable. If the PURCHASER pursues an appeal without the consent of the SELLER, or the SELLER pursues an appeal without the consent of the PURCHASER, then the applicable non-consenting party shall not be liable for indemnifying the other party for the cost of the appeal. The indemnifying party shall have the right to enter into a settlement agreement in connection with such Third Party Claim.

9.4    Notice of Claims.

-33-

(a)     The parties agree that in case any claim is made or any suit or action is commenced by any party that is not a party to this Agreement with respect to Actual Losses that may give rise to a right of indemnification (a "Third Party Claim"), or any knowledge is received of a state of facts which, if not corrected, may give rise to a right of indemnification, for such party hereunder ("Indemnified Party") from the other party ("Indemnifying Party"), the Indemnified Party will give notice to the Indemnifying Party as promptly as practicable after the receipt by the Indemnified Party of notice or knowledge of such claim, suit, action or state of facts. Notice to the Indemnifying Party under the preceding sentence shall be given no later than fifteen (15) days after receipt by the Indemnified Party of service of process in the event a suit or action has commenced or thirty (30) days under all other circumstances. The failure to give prompt notice shall not relieve an Indemnifying Party of its obligation to indemnify except to the extent the Indemnifying Party is prejudiced by such failure. Such notice shall describe in reasonable detail the issue that has or may result in indemnification pursuant to Section 9.1 or 9.2. The Indemnified Party shall (i) provide to the Indemnifying Party copies of all notices and documents (including court papers) received by the Indemnified Party relating to any Third Party Claim that are not separately addressed to the Indemnifying Party and (ii) make available to the Indemnifying Party and its counsel and accountants at reasonable times and for reasonable periods, during normal business hours, all books and records of the Indemnified Party relating to any Third Party Claim or other claim for indemnification, and each party hereunder will render to the other such assistance as it may reasonably require of the other in order to insure prompt and adequate defense of any suit, claim or proceeding based upon a state of facts which may give rise to a right of indemnification hereunder.

(b)     The Indemnifying Party shall have the right to defend, compromise and settle any Third Party Claim in the name of the Indemnified Party to the extent that the Indemnifying Party may be liable to the Indemnified Party in connection therewith. The Indemnifying Party shall notify the Indemnified Party within ten (10) Business Days of having received written notice pursuant to Section 9.4(a) of the Third Party Claim whether the Indemnifying Party elects to assume the defense of any such Third Party Claim and employ counsel, provided that the Indemnified Party does not object to such counsel in a reasonable exercise of its discretion. The Indemnified Party shall have the right to employ its own counsel if the Indemnifying Party so elects to assume such defense, but the fees and expenses of such counsel shall be at the Indemnified Party's expense, unless (i) the employment of such counsel shall have been authorized in writing by the Indemnifying Party; (ii) the Indemnifying Party shall not have employed counsel to take charge of the defense of such action prior to or promptly after electing to assume the defense thereof, or (iii) in the reasonable judgment of counsel to the Indemnified Party there is a reasonable basis for a possible conflict of interest between the Indemnified Party and the Indemnifying Party or there are defenses available to the Indemnified Party which are different from or additional to those available to the Indemnifying Party (in which case the Indemnifying Party shall not have the right to direct the defense of such action on behalf of the Indemnified Party), in any of which events said reasonable fees and expenses shall be borne by the Indemnifying Party.

(c)     Settlement of Claims. The Indemnified Party may at any time notify the Indemnifying Party of its intention to settle or compromise any claim, suit or action against the Indemnified Party (without the consent of the Indemnifying Party) in respect of which indemnification payments may be sought from the Indemnifying Party hereunder, provided that

-34-

the Indemnifying Party shall have no liability in respect of such settled or compromised claim, suit or action. Except to the extent provided in the preceding sentence, the Indemnified Party may not settle or compromise any claim, suit or action against the Indemnified Party without the consent of the Indemnified Party, which consent shall not be unreasonably withheld.

9.5     Subrogation.  The indemnifying party will be subrogated to any claim or right of the indemnified party as against any other persons with respect to any amounts paid by the indemnifying party under this Section 9.  The indemnified party will cooperate with the indemnifying party in the indemnifying party's assertion of the claim or right.

9.6     Survival of Indemnification.  Except as otherwise provided elsewhere in this Agreement, the obligations of the parties as set forth in this Section 9 will survive the Closing Date for a period of eighteen (18) months.  Notwithstanding any of the foregoing, any claim for indemnification for which notice is to be given under Section 9.4 by an indemnified party on or before the date that the indemnification would otherwise terminate in accordance with this Section 9.6, and the corresponding indemnification obligation, will survive until the claim is fully and finally determined and paid in full if payment is required under this Section 9.

9.7     Limitation on Indemnification.  Notwithstanding anything to the contrary herein, (a) in no event shall SELLER be required to indemnify or hold harmless PURCHASER or any such other parties as are entitled to indemnification or to be held harmless under Section 8.2, for any losses exceeding the aggregate amount of ~~_____~~ and (b) in no event shall SELLER be required to indemnify or hold harmless PURCHASER or any such other parties as are entitled to indemnification or to be held harmless under Section 8.2 for losses unless the aggregate sum of (i) such losses and (ii) the repurchase price for any Account repurchased pursuant to Section 10, exceeds ~~_____~~ (the "Indemnification Basket"), at which time SELLER shall be liable for all such losses and for the repurchase price for any Account repurchased pursuant to Section 10.

Section 10.     Conditional Repurchase by the SELLER After Closing Date.

10.1     PURCHASER'S Conditional Right to Require SELLER to Repurchase. Subject to the provisions of Section 9.7, PURCHASER shall have the right to require SELLER to repurchase any Account as to which on the Cut-Off Date, a breach of a representation or warranty described in Section 7.1(c), (e), (g), (i), (j) or (l) occurred with respect to such Account.

10.2     Exclusive Remedy.  PURCHASER acknowledges and agrees that the right to require repurchase by SELLER of any Account which meets the specific circumstances set forth above is the sole and exclusive remedy of PURCHASER for a breach of the representation or warranty set forth in Section 7.1(c), (e), (g), (i), (j) or (l), except in the event of a Third Party Claim for which indemnification is available under Section 9.1.

10.3     Limitation of PURCHASER's Right to Require Repurchase.  SELLER is not and shall not be obligated to repurchase any Account under Section 10.1 unless PURCHASER shall have given SELLER written notice of PURCHASER's election to require

*one hundred twenty*

such repurchase within 120 days of the Servicing Transfer Date specifying the grounds on which SELLER is required to repurchase the Account under Section 10.1 and accompanied by evidence reasonably acceptable to SELLER that establishes such grounds. Moreover, SELLER shall not be required to purchase any Account as to which:

      (a)   the terms have been modified in any material respect by a written or oral agreement between PURCHASER and the related Debtor; or

      (b)   PURCHASER has obtained full payment on the Account from the Debtor or any guarantor or surety therefor, or otherwise accepted partial payment thereof in full satisfaction of the debt evidenced thereby; or

      (c)   any of the Obligors are released by PURCHASER.

It is PURCHASER's obligation to provide, at PURCHASER'S expense, any evidence or proof reasonably satisfactory to SELLER that the conditions set forth in Section 10.3 are met. Notwithstanding anything to the contrary hereunder, SELLER shall not be obligated to repurchase any Account hereunder unless and until the aggregate sum of the amount of the repurchase price for all repurchase claims under Section 10.1 and of indemnification claims under Section 9.2 shall have exceeded the Indemnification Basket, and then SELLER shall be liable for all such repurchase and indemnification claims and losses.

      10.4   <u>Repurchase Price</u>.  The repurchase price for any Account pursuant to Section 10.1 shall be (a) the amount of (i) the Account Balance of each repurchased Account as of the Cut-Off Date, excluding any interest or fees accrued since the Cut-Off Date, multiplied by (ii) the Applicable Account-Level Purchase Price Percentage for such repurchased Account. PURCHASER shall, at the time of each such repurchase, remit (i) ~~100%~~ of the aggregate amount of payments received by PURCHASER, if any, in respect of such repurchased Account repurchased prior to the Servicing Transfer Date and (ii) ~~100%~~ of the aggregate amount of payments received by PURCHASER, if any, in respect of such repurchased Accounts repurchased on or after the Servicing Transfer Date. Such repurchase price shall be paid within forty-five (45) days following receipt of the applicable notice and proof as indicated above, and upon PURCHASER'S execution and delivery of any and all such documents as are necessary for PURCHASER to transfer to SELLER good, valid and marketable title to the Ineligible Accounts, subject to PURCHASER'S receipt of good, valid and marketable title as provided in Section 7.1(c).

      10.5   <u>Duties and Rights upon Repurchase</u>.  Upon repurchase of an Account, PURCHASER shall:

      (a)   Render to the SELLER a full accounting of the Account. Upon such accounting, PURCHASER may retain any money or value that PURCHASER received on the Account before PURCHASER's receipt of the SELLER's notice agreeing to repurchase the Account; provided that, after PURCHASER has received the SELLER's notice, PURCHASER will immediately cease releasing or compromising the Account, and PURCHASER shall

promptly remit any payments received on such Account from and after the date of PURCHASER's receipt of SELLER's notice;

(b)   Remit to the SELLER all payments received by PURCHASER from the Obligor(s) subsequent to the SELLER's notice;

(c)   Release, or transfer if possible or appropriate, all judgments, liens, garnishments, encumbrances or other legal action that PURCHASER may have instituted, obtained or attached to the Account;

(d)   Deliver to the SELLER all documents (i) in the PURCHASER's possession received from SELLER with respect to the Account or (ii) in the possession of an attorney or collection agency relating to the servicing of the Account by PURCHASER.

Section 11.   Miscellaneous.

11.1   Costs.   Each party will bear all costs and expenses incurred by it in connection with the negotiation and execution of this Agreement and the performance of the transactions contemplated in this Agreement, including, without limitation, counsel fees and expenses.

11.2   Insurance.   Without limiting PURCHASER'S indemnification or other liability to SELLER, PURCHASER will at all times during the term of this Agreement and until the remainder of the Purchase Price is paid in full, provide and maintain, at its own expense, insurance covering itself and its agents, representatives and subcontractors providing Services, with terms, conditions and with limits of liability as reasonably determined by PURCHASER to be appropriate for its business, provided that in the event PURCHASER commences the business of collection of accounts for others, PURCHASER shall be required to obtain professional liability insurance with a policy limit not less than such limit as is usual and customary for companies of similar size, maturity and business operations in PURCHASER's industry ("Coverages").

11.3   Notices.   All notices, instructions and other communications required or permitted to be given to or made upon either party will be in writing and will be delivered personally or sent by registered or certified mail, return receipt requested, by overnight courier, and will be deemed given on the date that the writing is delivered. Each notice will be addressed as set forth below, unless a party notifies the other party of a change of address from time to time using the procedures set forth in this Section 11.3.

To SELLER:   First Select, Inc.
C/o Providian Financial Corporation
201 Mission Street
San Francisco, California 94105
Attn: Chief Financial Officer

-37-

With a copy to:    Providian Financial
Legal Department
201 Mission Street
San Francisco, CA 94105
Attn:  General Counsel

To PURCHASER:    Credigy Receivables Inc.
7473 West Lake Mead Road, #216
Las Vegas, Nevada 89128
Attention: ~~████████~~

With a copy to:    Credigy
Two Sun Court
Suite 450
Norcross, GA 30092
Attention: ~~████████~~

11.4   _Dispute Resolution._  Any controversy between the parties arising from this Agreement will be resolved by arbitration in New York, New York in accordance with the Commercial Arbitration Rules of the American Arbitration Association and the parties shall be entitled to the rights of discovery authorized under the Federal Rules of Civil Procedure.  The award of the arbitrator shall be final and binding upon the parties. Each party shall bear its own attorneys' fees and other costs of the arbitration, and each shall pay one-half of the arbitrator's fees and expenses.  The arbitrator shall have the discretion to award reasonable attorneys' fees and the costs of the arbitration, including the fees of the arbitrator, to the prevailing party.  This Section 11.4 is not intended to limit or preclude any party from applying for or seeking any provisional or equitable remedy, nor shall the application of any party for such remedy operate as a waiver of its right to seek arbitration hereunder.

11.5   _Equitable Remedies._  Each party acknowledges that monetary damages would be inadequate to compensate (i) either party with respect to the breach or threatened breach by the other party of such party's obligations under Section 4 of this Agreement or (ii) SELLER with respect to the breach or threatened breach by PURCHASER of its obligations under Sections 5.2(a), 5.4, 5.8, 6.1 and 5.11 of this Agreement or (iii) PURCHASER with respect to the breach or threatened breach by SELLER of its obligations under Sections 5.5, 5.6, 5.14 and 6.1. Accordingly, the parties agree that equitable remedies, including injunction, shall be available for such party, as the case may be, with respect to any such breach or threatened breach.

11.6   _Assignment._  The rights of any party under this Agreement shall not be assigned or transferred by any party without the prior written approval of the other party hereto except as provided herein.  The parties hereto acknowledge that (i) purchaser intends to finance the purchase of the Acquired Assets through the pledge, transfer or sale of such Acquired Assets via securitization or other financing transactions pursuant to agreements entered into between PURCHASER and one or more other parties providing financing and (ii) such parties providing financing may syndicate, sell or otherwise transfer all or a portion of any such loan to third

-38-

parties. Purchaser may pledge or transfer its right, title and interest in the Acquired Assets and in and to this Agreement to the parties providing financing in connection with such securitization or other financing transaction, and the trustee, or other parties to such securitization or other financing transactions, shall be permitted to assign their rights to such third parties to whom any such loan was syndicated or participated.

11.7    Audit Rights.

(a)    SELLER Audit Rights. Subject to paragraph (d) below, from and after the Closing Date, upon delivery by SELLER of an officer's certificate certifying to a reasonable expectation of SELLER that information provided by PURCHASER to SELLER is inaccurate in any material respect, PURCHASER agrees, upon no less than three Business Days' notice and during regular business hours, to allow SELLER and an independent accounting firm selected by SELLER (subject to compliance with Section 4), at SELLER'S sole cost (subject to Section 11.7(c) below), to conduct periodic on-site audits of the PURCHASER'S business activities related to the Accounts. PURCHASER shall not retain any servicer or any other similar service provider with respect to all or any part of the Accounts unless the agreement with such servicer or service provider permits SELLER to conduct on site audits of the activities of such servicer or service provider with respect to the Accounts.

(b)    PURCHASER Audit Rights. From and after the Closing Date up to the Servicing Transfer Date, upon delivery by PURCHASER of an officer's certificate certifying to a reasonable belief that SELLER is not complying with any material obligation hereunder, SELLER agrees, upon no less than three Business Days' notice and during regular business hours, to allow PURCHASER and an independent accounting firm selected by PURCHASER (subject to compliance with Section 4), at PURCHASER'S sole cost (subject to Section 11.7(c) below), to conduct periodic on-site audits of the SELLER'S business activities related to the Accounts or this Agreement. SELLER shall not retain any service provider with respect to all or any part of the Accounts unless the agreement with such service provider permits PURCHASER to conduct on site audits of the activities of such service provider with respect to the Accounts.

(c)    In the event that any audit performed under this Section 11.7 results in a finding or other determination of material noncompliance by a party with its obligations hereunder, then the costs of performing such audit shall be borne and paid by the noncomplying party.

(d)    In the event at any time that SELLER shall have requested an audit hereunder, SELLER is engaged in competitive business activities with PURCHASER in regards to the collection of charged off consumer receivables, SELLER shall not be entitled to participate directly, but shall engage an independent accounting firm to conduct, such audit.

11.8    Benefit of this Agreement. Nothing contained in this Agreement, whether express or implied, is intended to confer any right or remedy on any person, legal or natural, as to this Agreement other than the parties to this Agreement, their respective Affiliates and their respective successors and permitted assigns, and no action may be brought against either party by any third party claiming to be a third-party beneficiary of this Agreement or the transactions contemplated in this Agreement. Nothing in this Agreement is intended to relieve or discharge

any obligation or liability of any third party to any party to this Agreement, and nothing in this Agreement will give, or be deemed to give, any third party any right of subrogation or action over or against either party to this Agreement.

11.9   Governing Law. This Agreement will be governed by and construed with the laws of the State of New York without reference to its conflict of laws principles.

11.10   Severability. If any provision in this Agreement is void or unenforceable by a court of competent jurisdiction, the unenforceability will not affect the validity or enforceability in any other jurisdiction or the validity or enforceability of any other provision in this Agreement.

11.11   Successors and Assigns. This Agreement will be binding on, and inure to the benefit of the parties and their respective successors and permitted assigns.

11.12   Attorneys Fees. In the event of any legal action or arbitration to enforce, declare the rights or obligations of any party to, rescind, or otherwise in connection with this Agreement, the prevailing party shall be entitled to reasonable attorneys fees and costs, including the fees and costs of any in-house counsel.

11.13   Consequential or Special Damages.   Under no circumstances shall any party hereto be entitled, in any arbitration or litigation relating to this Agreement or any transaction contemplated herein, to special or consequential damages.

11.14   Survival.   The provisions of Sections 4, 8.3 and 11 will survive the termination of this Agreement prior to Closing, subject to any time limitations set forth in such Sections.   Except for termination pursuant to Section 8.3(a), each party shall remain liable for any failure of such party to perform its obligations notwithstanding such termination.

11.15   Captions.   The captions in this Agreement are for convenience only and will not be used to construe or interpret any provision in this Agreement.

11.16   Counterparts.   This Agreement may be signed in one or more counterparts, each of which will constitute an original document and all of which will be taken together as one agreement.

11.17   Consents in Writing.   Any consent required or permitted to be given by any party hereunder shall be given in writing and delivered in accordance with the notice provisions hereof.

11.18   No Waiver. Any waiver of any term of this Agreement must be in writing and signed by each party. No delay or failure to act by a party or delay in performance or failure to perform any condition or any breach of any term, representation, warranty or covenant in this Agreement, whether by conduct or otherwise, will be deemed to be a further or continuing waiver of that condition or breach or a waiver of any other condition or breach. The rights and remedies of SELLER shall be cumulative and not exclusive of any other rights or remedies provided by law.

IN WITNESS WHEREOF, the parties through their respective duly authorized officers hereby execute this Agreement as of the date first shown above.

SELLER:

FIRST SELECT, INC.

PURCHASER:

CREDIGY RECEIVABLES INC.

By _____

Print Name _____

Title _____

By _____

Print Name ___ Brett M. Samsky ___

Title ___ Chief Executive Officer ___

485775263

IN WITNESS WHEREOF, the parties through their respective duly authorized officers hereby execute this Agreement as of the date first shown above.

SELLER:

FIRST SELECT, INC.

PURCHASER:

CREDIGY RECEIVABLES INC.

By _Jos Saunders_
Print Name _Joseph Saunders_
Title _____

By _____
Print Name _____
Title _____

<u>Bill of Sale</u>

First Select, Inc., for value received and in accordance with the terms of the Purchase and Sale Agreement between First Select, Inc. and Credigy Receivables Inc. ("PURCHASER"), dated as of December 27, 2002 (the "Agreement"), does hereby sell, assign and transfer to PURCHASER, its successors and assigns, all right, title and interest in and to the Acquired Assets, without recourse and without representation or warranty, including without limitation relating to collectibility, except to the extent of any representations or warranties expressly stated in the Agreement.

Executed on Dec. 30, 2002

FIRST SELECT, INC.

By Joseph L. Saunders

Print Name Joseph Saunders

Title _____

EXHIBIT "A"

## POWER OF ATTORNEY – PURCHASE AND SALE AGREEMENT

(a) First Select, Inc., a Delaware corporation ("Seller"), hereby irrevocably constitutes and appoints Credigy Receivables, Inc., a Nevada corporation ("Attorney"), with full power of substitution, acting through any officer, employee or agent appointed by Attorney, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of Seller and in its own name, or, if specifically authorized below, in the name of Seller, from time to time, for the purpose of carrying out the terms of that certain Purchase and Sale Agreement, dated as of December 27, 2002, by and between Seller and Attorney as Purchaser thereunder (collectively the "Agreement"; capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement) to take any and all appropriate action to accomplish, and to execute and deliver any and all documents and instruments which may be necessary or desirable to accomplish, the purposes of the Agreement; and, without limiting the generality of the foregoing, Seller hereby grants to Attorney, the power and right, at any time, to do the following:

(i) in the name of Seller or in its own name, endorse Seller's name upon any checks, drafts, notes, acceptances, money orders and other remittances received by Seller or Purchaser on account of the Acquired Assets;

(ii) in Attorney's own name, direct any party liable for any payment under or in respect of any of the Acquired Assets to make payment of any and all monies due or to become due thereunder, directly to Attorney or Purchaser or as Attorney shall direct;

(iii) in Attorney own-name, in sign and endorse any invoices express bills, drafts against debtors, assignments, verifications, and notices in connection with accounts and other documents constituting or related to the Acquired Assets;

(iv) in Attorney's own name, settle, compromise or adjust any suit, action, or proceeding described above and, in connection therewith, give such discharges or releases as Attorney may deem appropriate;

(v) in Attorney's own name, file any claim or take or commence any other action or proceeding in any court of law or equity or otherwise deemed appropriate by Attorney for the purpose of collecting any and all such monies due under the Acquired Assets whenever payable;

(vi) in Attorney's own name, commence and prosecute any suits, actions or proceedings of law or equity in any court of competent jurisdiction to enforce any other right in respect of the Acquired Assets;

(vii) in Attorney own name, defend any suit, action or proceeding brought against Seller with respect to the Acquired Assets if Seller does not defend such suit, action or proceeding or if Attorney believes that Seller is not pursuing such defense in a manner that will maximize the recovery with respect to the Acquired Assets; and

*Power of Attorney (Agreement)*

1

(viii) (A) in Seller's name (provided Attorney's status as attorney-in-fact is disclosed) or in Attorney's own name, execute such documents as are necessary or desirable to:

(1) assign Seller's right, title and interest in and to judgments relating to the Accounts;

(2) substitute Purchaser for Seller as plaintiff in any litigation or bankruptcy proceeding or;

(3) assign Seller's right, title and interest in Accounts subject to consumer credit counseling service agreements, and

(B) in Attorney's own name, execute such pleadings, instruments, assignments, bills, receipts, affidavits, certifications and other documents as Attorney deems necessary to effectuate the full transfer of the Acquired Assets to Purchaser or to assist in the enforcement or collection of any Acquired Asset; and

(b) Seller hereby authorizes Attorney shall lawfully, and in accordance with the Agreement, do or cause to be done by virtue hereof and waives notice of presentment, protest and dishonor of any instrument endorsed by Attorney pursuant to this Power of Attorney or in connection with the transactions contemplated by the Agreement. The power of attorney granted pursuant to this Power of Attorney is a power coupled with an interest and shall be irrevocable for a period commencing on the Servicing Transfer Date and ending twenty-four (24) months thereafter.

(c) The powers conferred on Attorney hereunder are solely to protect Purchaser's interests in the Acquired Assets and shall not impose any duty upon it to exercise any such powers. Attorney shall not be responsible to Seller for any act taken in good faith and with due care to protect Purchaser's interest, or any failure to take such action.

(d) Notwithstanding any other provisions herein, this Power of Attorney is subject to the terms and conditions of the Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Power of Attorney this of December 30Th, 2002.

FIRST SELECT, INC.

By: _____

Name: Anthony Vuoto

Title: Chief Financial Officer

40576533.2

*Power of Attorney (Agreement)*

2